# IN THE SUPREME COURT OF IOWA

No. 15–2122

Filed May 12, 2017

**IN RE THE DETENTION OF JEFFREY ANDERSON,**

**JEFFREY ANDERSON,**

Appellant.

---

Appeal from the Iowa District Court for Polk County, Arthur E. Gamble, Judge.

The district court revoked the release-with-supervision status of a person committed under the Sexually Violent Predators Act. The committed person now argues the revocation of his release-with-supervision status and his placement in the transitional release program violates due process. **AFFIRMED.**

Michael H. Adams, Local Public Defender, and Amy Kepes, Assistant Public Defender, for appellant.

Thomas J. Miller, Attorney General, and Gretchen Kraemer, Assistant Attorney General, for appellee.

**ZAGER, Justice.**

Jeffrey Anderson was civilly committed to the Civil Commitment Unit for Sexual Offenders (CCUSO) under the Sexually Violent Predators Act (SVPA). He was later granted release with supervision to the Fort Des Moines Residential Facility. After he violated the terms of his release-with-supervision plan, the district court revoked his release-with-supervision status and ordered him placed at the transitional release program housed at CCUSO. Anderson now challenges the district court order placing him in the transitional release program at CCUSO as a violation of his rights under the Due Process Clauses of the United States Constitution and the Iowa Constitution. For the reasons stated below, we hold that the district court order placing Anderson in the transitional release program at CCUSO did not violate due process.

## I. Background Facts and Proceedings.

On June 23, 2011, a jury determined that Jeffrey Anderson is a sexually violent predator (SVP) under Iowa Code chapter 229A. *See* Iowa Code § 229A.7(5) (2011). Between 1977 and 1994, Anderson sexually assaulted or attempted to sexually assault six different girls and women. In 1977, at the age of fourteen, Anderson attempted to sexually assault a nine-year-old girl. He received probation. In March 1982, at the age of nineteen, he was charged with assault with intent to commit sexual abuse for choking and raping a college-aged woman. In April 1982, Anderson was charged with sexual abuse in the second degree for the attempted rape of a female acquaintance. He pled guilty to one count of assault with intent to commit sexual abuse for the two 1982 charges and was given a sentence of two years' incarceration. During this incarceration, he completed the Iowa Sex Offender Treatment Program (SOTP). In 1983, at the age of twenty, Anderson raped a twenty-one-

year-old physically handicapped woman. He pled guilty to sexual abuse in the third degree and was sentenced to a ten-year term of incarceration. He again completed the SOTP while incarcerated. In 1993, at the age of thirty, Anderson was charged with kidnapping and sexual abuse in the second degree for sexually assaulting a twenty-one-year-old female acquaintance. He was convicted of simple assault. In 1994, at the age of thirty-one, he was charged with burglary in the first degree, assault with intent to commit sexual abuse, and sexual abuse in the third degree after he went to the home of a coworker and raped her in front of her son. He was found guilty of all three counts and sentenced to thirty-five years' incarceration. Anderson participated in SOTP twice during this incarceration, but never completed the program. He was removed from the program on his first attempt because his account of the sexual assaults differed from the official records. He was removed from the program on his second attempt for refusal to participate.

Adjudicating Anderson as an SVP means the jury determined, beyond a reasonable doubt, that Anderson suffered from a mental abnormality which made him likely to engage in predatory acts constituting sexually violent offenses. *See id.* § 229A.2(11) (now .2A(12)). Anderson was committed to the custody of the director of the Iowa Department of Human Services (DHS) for control, care, and treatment until such time as his mental abnormality has so changed that he is safe to be placed in a transitional release program or discharged. *Id.* § 229A.7(5)(*b*). While he was under the control, care, and treatment of DHS, he was placed at its secure facility in CCUSO. During treatment, Anderson admitted to numerous other sexual assaults. Anderson has been diagnosed with personality disorder not otherwise specified (non-consent) and antisocial personality disorder.

After an annual review on November 13, 2014, Anderson submitted a report from Dr. Richard Wollert. In the report, Dr. Wollert opined that Anderson was no longer likely to engage in sexually predatory acts constituting sexually violent offenses if he were given the chance to be released from CCUSO. Dr. Wollert further opined that Anderson was a suitable candidate for the transitional release program at CCUSO. Based upon this report, Anderson requested a final hearing. After considering all of the evidence presented, the district court set the matter for a final hearing.

Trial on whether Anderson's commitment should continue commenced on February 11, 2015. The jury returned a verdict two days later with the following answers:

> Question No. 1: Did the State prove by evidence beyond a reasonable doubt that Respondent's mental abnormality remains such that he is likely to engage in predatory acts that constitute sexually violent offenses if discharged? ANSWER: . . . No.

> Question No. 2: Did the State prove by evidence beyond a reasonable doubt that Respondent is not suitable for placement in a transitional release program? ANSWER: . . . Yes.

Because the parties considered the jury's answers to be inconsistent, the district court ordered further briefing. The district court set a hearing for March 12 to determine the meaning of the verdicts and to answer the constitutional issues raised. The district court conducted the hearing on March 20 and issued its order on March 27. The district court held that it was in the best interest of the community for Anderson to be released with supervision before being discharged from CCUSO. The district court further found that the State proved release with supervision would help Anderson safely reenter society. The district court noted, "[T]he Respondent now agrees that he should be released with supervision

under a release plan coordinated by DHS and the Fifth Judicial District Department of Correctional Services." The district court also ordered,

> Consistent with due process and the opinion of the Supreme Court in *Matlock*[1] and pursuant to Iowa Code Section 229A.9A(2), within sixty (60) days of March 20, 2015, DHS shall prepare a release plan addressing Respondent's needs for counseling, medication, community support services, residential services, vocational services, alcohol and other drug abuse treatment, sex offender treatment, or any other treatment or supervision necessary.

DHS, in coordination with the Iowa Department of Correctional Services (DCS), filed the release-with-supervision plan on May 19, and the district court held a hearing on the plan on May 22. Without objection by Anderson, the district court approved the release-with-supervision plan as written and ordered the sheriff to transport Anderson to the Fort Des Moines Residential Facility. Anderson was placed under the supervision of the Fifth Judicial District DCS. Pursuant to Anderson's release plan, he was not allowed to have sexual contact with another person without permission while he was living at the Fort Des Moines facility. The terms of his release-with-supervision plan required him to disclose "all pertinent and relevant information" about any potential romantic relationship to DCS for approval. Additionally, the Fort Des Moines facility has its own rules and regulations that Anderson was required to comply with. One such rule prohibits residents of the facility from engaging in sexual contact with another resident.

On October 16, another resident of the Fort Des Moines facility, T.B., reported that Anderson sexually assaulted him while Anderson was driving him to work. T.B. reported that Anderson asked him if he needed a ride and he accepted. While they were driving, the two made small talk

---

[1]*In re Det. of Matlock*, 860 N.W.2d 898, 901 (Iowa 2015).

and Anderson told T.B. that he is homosexual. Anderson then pulled into a parking lot. T.B. asked Anderson why they were stopping, and Anderson did not respond. Anderson told T.B. he was pretty and then started to undo his pants. T.B. tried to push Anderson off, but Anderson pinned him down and began to perform oral sex. T.B. reported that he was initially too scared to move but was eventually able to push Anderson off of him. T.B. left the car and jogged across the street to get away from Anderson. After T.B. left, he approached an off-duty police officer who was working as a security guard at the DART Central Station. T.B. called his counselor at the Fort Des Moines facility to report the incident. T.B. then made a police report with the officer.

When confronted, Anderson claimed the sexual activity was consensual and that T.B. initiated the contact. However, based on the police report filed regarding the incident and incident reports obtained from the Fort Des Moines facility, the State filed a motion for ex parte revocation alleging that Anderson had violated the terms of his release-with-supervision plan.

T.B. later recanted and said the sexual contact was consensual. On October 19, the State filed an amended motion to include the information that T.B. had recanted his claim that the sexual contact was nonconsensual. However, the conduct was still in violation of Anderson's release-with-supervision plan and the rules and regulations of the Fort Des Moines facility. On October 22, the district court filed an order commanding the sheriff to transport Anderson to the secure custody of CCUSO pending a hearing.

On November 16, the district court held a hearing on the motion to revoke Anderson's release-with-supervision status. Anderson stipulated that he had sex with an eighteen-year-old resident of the Fort Des

Moines facility without permission, which was against the rules of the facility and in violation of his release-with-supervision plan.

Anderson testified as to his version of the incident. Anderson testified that the sexual encounter occurred while he was on his way to work. Anderson picked T.B. up away from the facility. While driving, Anderson and T.B. started discussing their age difference. At the time, Anderson was fifty-two and T.B. was eighteen. Anderson testified that T.B. began "hitting on" him, and he was surprised because of their age difference. He further testified that T.B. was the initiator of the sexual contact. According to Anderson, T.B. suggested Anderson pull the car over. According to Anderson, he then entered the backseat and engaged in sexual activity with T.B. at T.B.'s request. The district court found Anderson's version of the encounter not credible. It likewise found Dr. Wollert's testimony less credible because Dr. Wollert believed Anderson's version of events.

Dr. Tony Tatman also testified at the hearing. Dr. Tatman testified about the sexual contact and how it related to Anderson's cycle of offending. Dr. Tatman testified that Anderson's placement of all the responsibility of the sexual encounter on the eighteen-year-old T.B. was consistent with Anderson's manipulative behavior. Dr. Tatman also testified that the encounter, which took place outside the facility, demonstrated advance planning. Dr. Tatman further testified that Anderson's choice in a sexual partner was consistent with his offending cycle. Dr. Tatman opined that the sexual encounter seemed at odds with a mutually consensual act, even though T.B. later recanted. Dr. Tatman testified that following the sexual encounter, T.B. immediately left the vehicle, obtained access to a phone, and reported the assault both to his facility counselor and directly to the police.

On November 18, the district court issued its order revoking Anderson's release-with-supervision status. It found that Anderson violated a provision of his release-with-supervision plan by having sex without prior approval from his counselor at the Fort Des Moines facility and by having sex with an inappropriate partner. The district court made credibility findings and found credible Dr. Tatman's testimony that Anderson was at a higher risk after the violation than at the time of the jury proceeding. However, the district court also noted that Dr. Tatman could not say whether Anderson was more likely than not to reoffend. The district court revoked Anderson's release-with-supervision status and ordered him to be placed in the transitional release program, which is located at CCUSO. Anderson timely appealed the district court order. We retained the appeal.

## II. Standard of Review.

Our review of constitutional claims is de novo. *In re Det. of Matlock*, 860 N.W.2d 898, 901 (Iowa 2015). To the extent Anderson's claims require us to interpret provisions of our SVPA, we review the district court's construction and interpretation of the statute for correction of errors at law. *In re Det. of Cubbage*, 671 N.W.2d 442, 444 (Iowa 2003).

## III. Analysis.

**A. Error Preservation.** The State argues Anderson did not preserve error on his claim that revoking his release-with-supervision status and placing him in the transitional release program at CCUSO violates due process. The State claims that error was not preserved because the district court did not rule on the constitutional issue from the bench, and Anderson did not provide authority for the argument beyond citation to the constitutions. Anderson responds that error was

preserved because the argument was raised to the district court during the hearing, and the district court's ruling overruled the argument even though it did not expressly address the constitutional claim.

Our general rule of error preservation is that we will not decide an issue presented before us on appeal that was not presented to the district court. *See, e.g., City of Postville v. Upper Explorerland Reg'l Planning Comm'n,* 834 N.W.2d 1, 8 (Iowa 2013). In order for error to be preserved, the issue must be both raised and decided by the district court. *Bank of Am., N.A. v. Schulte,* 843 N.W.2d 876, 883 (Iowa 2014).

> The reason for this principle relates to the essential symmetry required of our legal system. It is not a sensible exercise of appellate review to analyze facts of an issue "without the benefit of a full record or lower court determination."

*Meier v. Senecaut,* 641 N.W.2d 532, 537 (Iowa 2002) (quoting *Yee v. City of Escondido,* 503 U.S. 519, 538, 112 S. Ct. 1522, 1534 (1992)). The underlying requirement of error preservation is to give opposing counsel notice of the argument and opportunity to be heard on the issue. *Lee v. State,* 815 N.W.2d 731, 739 (Iowa 2012). However, our error preservation rules were not designed to be hypertechnical. *Griffin Pipe Prods. Co. v. Bd. of Review,* 789 N.W.2d 769, 772 (Iowa 2010).

Similarly, it is a fundamental principle of our appellate review that "we assume the district court rejected each defense to a claim on its merits, even though the district court did not address each defense in its ruling." *Meier,* 641 N.W.2d at 539. When we review a district court's ruling,

> [w]e first examine the basis upon which the trial court rendered its decision, affirming on that ground if possible. If we disagree with the basis for the court's ruling, we may still affirm if there is an alternative ground, raised in the district

court and urged on appeal, that can support the court's decision.

*Hawkeye Food Distrib., Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 609 (Iowa 2012) (quoting *Fencl v. City of Harpers Ferry*, 620 N.W.2d 808, 811–12 (Iowa 2000) (citation omitted)).  We have applied this rule to both affirm and reverse a district court's ruling.  *Id.* at 609–10.

During the hearing to determine whether revocation of Anderson's release-with-supervision status was appropriate, Anderson's attorney argued that not allowing him to continue with release with supervision "would be a violation of Mr. Anderson's liberty interest and due process under both the U.S. Constitution, the Fourteenth Amendment, and the Iowa Constitution, Article 1, Section 9."  While counsel conceded that release with supervision was appropriate, she noted that the district court's ruling on Anderson's status needed to comport with the Constitution.  Counsel further argued the State had not demonstrated that Anderson was more likely than not to reoffend and that this was the standard necessary to order him back to CCUSO.

The district court's order revoking Anderson's release-with-supervision status did not address any of the constitutional arguments.  Anderson never filed a motion requesting the district court rule on the constitutional issues.  However, the issue of constitutionality was raised throughout the proceedings.  Opposing counsel had sufficient notice that the constitutionality of Anderson's revocation of release-with-supervision status would be an issue on appeal.  Error was preserved.

**B. Substantive Due Process.**  Anderson argues that the district court's decision to revoke his release-with-supervision status and place him in the transitional release program at CCUSO violates his right to due process under both the United States Constitution and the Iowa Constitution.  He argues that the revocation of his release-with-

supervision status and placement in the transitional release program violates substantive due process for two reasons: (1) there was no finding that he was more likely to sexually reoffend, and (2) the conditions imposed do not balance the interest of the community against his liberty interest. The State responds that the statute does not require the district court to find Anderson is more likely to reoffend in order to transfer him to the transitional release program after he had been released with supervision. The State further argues that substantive due process has been satisfied by the statute because there is a reasonable relationship between the State's objective of protecting society and the district court's discretion to determine where an individual who has violated the terms of release with supervision should be placed pending the next annual review.

The Due Process Clause of the United States Constitution provides that a state may not "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. Similarly, the Iowa Constitution provides that "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9.

Traditionally, we have "considered the federal and state due process provisions to be equal in scope, import, and purpose." *Matlock*, 860 N.W.2d at 903 (quoting *In re Det. of Garren*, 620 N.W.2d 275, 284 (Iowa 2000)). We reserve the right to construe our state constitution differently from the United States Constitution. *Id.* This is true even when the two provisions "contain nearly identical language and appear to have the same scope, import, and purpose." *Id.*; *see also State v. Kooima*, 833 N.W.2d 202, 206 (Iowa 2013). When a party does not suggest a framework for analyzing the Iowa Constitution that is different from the framework utilized under the United States Constitution, we

apply the general federal framework. *Matlock*, 860 N.W.2d at 903. However, we reserve the right to apply the federal framework in a different manner. *Id.*

When a substantive due process violation is alleged, we follow a two-step analysis. *King v. State*, 818 N.W.2d 1, 31 (Iowa 2012). The first step is to determine the nature of the right involved and the second is to determine the appropriate level of scrutiny to apply. *Id.* If the right is a fundamental right, we apply strict scrutiny. *Id.* For other rights, we apply a rational basis test. *Id.* The core of the Due Process Clause is an individual's right to be free from bodily restraint caused by arbitrary actions by the government. *Matlock*, 860 N.W.2d at 903; *see Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S. Ct. 1780, 1785, (1992). This liberty interest is not absolute. *Garren*, 620 N.W.2d at 284.

We have previously addressed a number of substantive due process questions in the context of our SVPA. In *Garren*, a committed person challenged the SVPA, arguing that the committal process violated his substantive due process rights because it did not allow the court to consider a less restrictive alternative to placing him at CCUSO. *Id.* at 284–85. We addressed the United States Supreme Court's decision in *Kansas v. Hendricks*, 521 U.S. 346, 117 S. Ct. 2072 (1997). *Id.* at 279. In *Hendricks*, the Court held that Kansas's civil commitment statutes were civil in nature and therefore did not trigger the same constitutional protections afforded criminal defendants. 521 U.S. at 361, 117 S. Ct. at 2082. The Court also held that a finding of dangerousness, coupled with proof of an additional factor such as mental illness or abnormality, was sufficient for the Kansas SVPA to withstand a substantive due process challenge. *Id.* at 361–62, 117 S. Ct. at 2082.

As a threshold matter, we held that our SVPA, which is similar to the Kansas statute, is civil in nature. *Garren*, 620 N.W.2d at 283. We also noted that our SVPA is similar in nature and scope to the Kansas SVPA and other civil commitment statues that have survived substantive due process challenges. *Id.* at 284–85. We found that Garren's least restrictive alternative argument also did not survive a substantive due process challenge. *Id.* at 285. Even if a right exists to the least restrictive alternative placement, the right is not a fundamental right. *Id.* Therefore, the most substantive due process required for Garren's challenge to the SVPA was a "reasonable fit between the governmental purpose and the means chosen to advance that purpose." *Id.* (quoting *In re B.B.*, 516 N.W.2d 874, 879 (Iowa 1994)).

In *Cubbage*, the petitioner argued he had a substantive due process right to be competent during the course of his SVPA proceedings. 671 N.W.2d at 445. We were first required to determine whether Cubbage's right to competency was a fundamental right, triggering a strict scrutiny analysis, or whether a rational basis analysis was appropriate. *Id.* at 446–48. Again, the fact that our SVPA is civil in nature was the key. *Id.* at 447–48. We noted that both the Supreme Court and our own precedents have held that a "criminal trial of an incompetent defendant violates due process." *Id.* at 447 (quoting *State v. Rieflin*, 558 N.W.2d 149, 152 (Iowa 1996), *overruled in part on other grounds by State v. Lyman*, 776 N.W.2d 865, 873 (Iowa 2010)). However, Cubbage's challenge arose in a civil context, and the Supreme Court has not yet recognized the same fundamental right to competency for civil commitment proceedings. *Id.* at 447. We agreed and held that Cubbage did not have a fundamental right to competency during his SVPA proceedings. *Id.* Because Cubbage's right to competency was not

fundamental, we applied a rational basis test to determine whether substantive due process was violated. *Id.* at 448. We weighed whether there was "a reasonable fit between the governmental purpose and the means chosen to advance that purpose" and found that there was. *Id.* at 448 (quoting *Garren*, 620 N.W.2d at 285).

Although we applied a rational basis test in both *Garren* and *Cubbage*, we applied a more stringent test to determine what process was due in *Matlock*, 860 N.W.2d at 904, 907–08. Matlock challenged the district court's order imposing release with supervision. *Id.* at 903. The district court found that the State proved beyond a reasonable doubt that he suffered from a mental abnormality, but that the State failed to prove beyond a reasonable doubt that he was likely to engage in future sexually violent offenses if discharged. *Id.* at 904. Relying on *Hendricks*, we noted that we would weigh Matlock's liberty interest against the State's reason for restraining his liberty interest in order to determine whether a substantive right was violated. *Id.* at 904.

We held that, under the SVPA, "if a person still suffers from a mental abnormality, but the State cannot prove he or she is likely to engage in acts of sexual violence upon release, the courts must release that person." *Id.* at 905. If the State is unable to demonstrate both, then continued confinement violates the committed person's due process rights. *Id.* However, if the court finds that the State proved release with supervision would help the committed person safely reenter society, the court may impose certain conditions. *Id.*

Matlock also challenged the conditions of his release under due process. *Id.* We noted that conditions of release plans implicate a liberty interest for the committed person. *Id.* Because of that liberty interest,

> [d]ue process requires the court to properly balance the interest of the community against the liberty interest of a person suffering from a mental abnormality who is not likely to engage in acts of sexual violence upon release. To do this, the district court must strike the proper balance between the treatment needs of a person released with supervision and the protection of the public.

*Id.* at 907 (citation omitted). We remanded the case so the court could determine whether Matlock's release-with-supervision plan properly balanced his interests against those of the community. *Id.* at 908.

Anderson's case presents us with an issue of first impression, as we have never engaged in a substantive due process analysis of the statute granting the court discretion in determining the appropriate placement after a committed person violates the terms of release with or without supervision. Here, the court's placement options have the potential to restrict Anderson's liberty, which is a fundamental right. Because of the liberty interest implicated in Anderson's revocation hearing, a heightened standard of review is appropriate. *King*, 818 N.W.2d at 31 (noting that strict scrutiny applies if a right is fundamental). As in *Matlock*, the appropriate test is to weigh the individual's liberty interest against the State's reason for restraining the individual's liberty. 860 N.W.2d at 904.

1. *Iowa statute.* Iowa Code section 229A.8 is the statute that sets forth the procedures for determining whether the individual is entitled to a final hearing. Iowa Code § 229A.8 (2016). This Code section provides that there is a rebuttable presumption that commitment should continue for individuals civilly committed under the SVPA. *Id.* § 229A.8(1). At the annual review hearing, the committed person has the burden to demonstrate by a preponderance of the evidence that "relevant and reliable evidence" exists to rebut this presumption. *Id.* § 229A.8(5)(*e*)(1). If the committed person is able to provide this relevant and reliable

evidence, the district court shall hold a final hearing. *Id.* § 229A.8(5)(*e*)(2). At the final hearing, the State has the burden to demonstrate beyond a reasonable doubt either of the following: (1) "[t]he committed person's mental abnormality remains such that the person is likely to engage in predatory acts that constitute sexually violent offenses if discharged," or (2) "[t]he committed person is not suitable for placement in a transitional release program pursuant to section 229A.8A." *Id.* § 229A.8(6)(*d*). In *Matlock*, we noted that the State must demonstrate that a person committed under the SVPA still suffers a mental abnormality *and* is likely to engage in sexually violent acts if released in order to justify continued confinement. 860 N.W.2d at 905.

However, we did not decide in *Matlock* whether continued confinement was still justified if the jury decided, as it did here, that the State had met its burden of proof that Anderson was not suitable for placement in a conditional release program. Nor do we need to decide the issue in this case. After several hearings conducted by the district court regarding how to interpret the jury's answers, the State and Anderson stipulated that he would be released under the terms of supervision accepted by the district court.

It is important to understand the interplay between the multiple statutory provisions that apply to Anderson's situation. As a result of the final hearing, there were a range of placement options that potentially applied to Anderson. First, since the State proved beyond a reasonable doubt that Anderson was not suitable for conditional release, he arguably could have been returned to the appropriate secure facility at CCUSO. Iowa Code § 229A.8. Because of some confusion regarding the effect of the jury's verdicts, this was not considered. As will be discussed later in greater detail, the State and the committed individual

may stipulate to a transfer to a transitional release program. *See id.* § 229A.8(7). That is what occurred here.

"Transitional release" is defined as a "conditional release *from a secure facility* operated by the department of human services with the conditions of such release set by the court or the department of human services." *Id.* § 229A.2(13) (emphasis added). This differs from "discharge," which is defined as "an unconditional discharge from the sexually violent predator program." *Id.* § 229A.2(4). Therefore, the transitional release program located at CCUSO was a second placement option for the district court, even though it was not recommended by the State or the jury, or stipulated to by Anderson. It would have been, however, a conditional release from a secure facility.

These were not the only placement options available to the district court under the facts here. The statute provides that in any proceeding under section 229A.8, the court may order the committed person released with or without supervision. *See id.* § 229A.9A. Both of these placement options are likewise conditional release from a secure facility. *Id.* Release with supervision was the placement option stipulated to by the State and Anderson, which constituted a conditional release from a secured facility.

Anderson was released from CCUSO under the terms and conditions set forth in a release plan prepared by DHS and the Fifth Judicial District DCS, and approved by the district court. Once an SVP is released with supervision, the provisions of section 229A.9B provide the procedure for determining violations of the terms of release. The procedures provided are quite different from the procedures required for a committed person's annual review and final hearing. *Compare id.* § 229A.8, *with id.* § 229A.9B. Once a final hearing is held under section

229A.8, and the district court determines that the individual release with or without supervision plan is appropriate, the court thereafter retains jurisdiction over the committed person until he or she is discharged from the program. *Id.* § 229A.9A(8).

During the time a committed person is released with supervision but not yet discharged, he or she may violate the terms of supervision. The Code provides detailed procedures to be utilized in the case of an alleged violation. *Id.* § 229A.9B. Notably, section 229A.9B makes no mention of a requirement to demonstrate either mental abnormality or likelihood of engaging in future sexually violent offenses. *Id.* If the agency with jurisdiction determines a committed person has violated the terms of a release plan, the agency may request that the district court enter an emergency ex parte order directing law enforcement to return the committed person to a secure facility pending a hearing. *Id.* § 229A.9B(1). Once the committed person is returned to a secure facility, the district court must set a date for a hearing to determine whether a violation of the release plan occurred. *Id.* § 229A.9B(3). At the hearing, the attorney general has the burden to demonstrate by a preponderance of the evidence that the committed person violated the terms of the release plan. *Id.* § 229A.9B(4). If the district court determines a violation has occurred, it then has the discretion to return the committed person to release with or without supervision, place the committed person in a transitional release program, or confine the committed person to a secure facility. *Id.* § 229A.9B(5).

These placement options have varying degrees of restrictions, with the final option available to the court being secure confinement. Release with or without supervision is the least restrictive option available to the court. *See id.* § 229A.9A. Although the transitional release program is

housed at the same facility as CCUSO, it is not the same as confinement in a secure facility. *Compare id.* § 229A.2(13), *with id.* § 229A.2(2). "Transitional release" is defined by the statute as "a conditional release from a secure facility operated by the department of human services with the conditions of such release set by the court or the department of human services." *Id.* § 229A.2(13). In contrast, "secure facility" is defined as "a state facility that is designed to confine but not necessarily to treat a sexually violent predator." *Id.* § 229A.2(2). This distinction is acknowledged in other places in the SVPA. Section 229A.7 notes that SVPs are housed at appropriate secure facilities "[a]t all times prior to placement in a transitional release program or release with or without supervision." *Id.* § 229A.7(7).

2. *Other state statutes.* A number of states have statutes similar to Iowa Code section 229A.9B regarding revocation that have not faced a due process challenge in court.

In Kansas, the state carries the burden of demonstrating by probable cause that a person in a transitional release program violated the terms and conditions of the release. Kan. Stat. Ann. § 59-29a08(f), (g) (West, Westlaw current through 2017 Reg. Sess.). If the state meets this burden, the court has the discretion to return the individual to secure confinement or back to the transitional release program with or without additional conditions. *Id.* § 59-29a08(g).

In Missouri, a committed person must be placed on conditional release if the court finds the person's "mental abnormality has so changed that the person is not likely to commit acts of sexual violence if released." Mo. Ann. Stat. § 632.505(1) (West, Westlaw current with emergency legis. through Mar. 30, 2017). However, if the court finds by a preponderance of the evidence that the individual has violated the

terms of conditional release, the court has a number of options. *Id.* § 632.505(7)(7). The court may revoke the conditional release and return the committed person to a secure facility. *Id.* The court may also modify or increase the conditions of release. *Id.* If an individual's conditional release is revoked, he or she may not petition the court for subsequent conditional release for a minimum of sixth months. *Id.* § 632.505(7)(8).

In Virginia, if a petition is filed alleging an individual on conditional release has violated the terms of release, the court that originally conditionally released the individual must hold a hearing to determine the individual's status. Va. Code Ann. § 37.2-913(C) (West, Westlaw current through 2016 Reg. Sess.). "If upon hearing evidence," the court determines that the individual violated the terms of release, the court has the option to return him or her to secure custody. *Id.* § 37.2-913(D). The secured individual then must wait at least six months before petitioning for re-release. *Id.*

In Wisconsin, the state bears the burden of demonstrating by clear and convincing evidence that either a term of conditional release has been violated or the individual poses a danger to the community. Wis. Stat. Ann. § 980.08(8) (West, Westlaw current through 2017 Act 6). If the state meets its burden, the court has the discretion to revoke the conditional release. *Id.* While the court has the discretion to consider alternatives to revocation, the court may choose to place the individual in institutional confinement for the violation. *Id.*

In Washington, the state bears the burden of proving by a preponderance of the evidence that an individual on conditional release has either violated the terms of the conditional release order or that the individual is in need of additional treatment. Wash. Rev. Code Ann. § 71.09.098(5)(c) (West, Westlaw current through 2016 Reg. & Spec.

Sess.). If the state meets this burden, the court weighs five factors to determine whether to revoke the conditional release or to modify the terms. *Id.* § 71.09.098(6)(a), (7), (8). The court has the discretion to order an individual back to total confinement. *Id.* § 71.09.098(8).

3. *Approach of other courts.* Other courts have considered the difference in standards required for continued secure confinement and the standards required to revoke a release status after a violation has been found.

In Arizona, a jury found John Sanchez to be a sexually violent person as defined by the Arizona Sexually Violent Persons Act (SVPA), and he was committed for placement at a treatment center. *In re Pima Cty. Mental Health Cause No. A20020026*, 352 P.3d 921, 923 (Ariz. Ct. App. 2015). Sanchez later petitioned for release to a less restrictive environment. *Id.* The court found that the state was unable to meet its statutory burden of demonstrating by proof beyond a reasonable doubt that Sanchez's "disorder has not changed and that he is likely to engage in acts of sexual violence if discharged." *Id.* The court ordered conditional release. *Id.* Sanchez later admitted to touching a young girl on her back, and the district court revoked his conditional release status. *Id.* After a hearing, the district court revoked Sanchez's conditional release and committed him to secure confinement. *Id.* Sanchez appealed, arguing that the revocation of his conditional release and return to confinement was improper. *Id.* at 923–24.

Similar to the Iowa SVPA, Arizona requires different burdens of proof and different showings for a hearing following an annual review and for a hearing to determine whether release status should be revoked. *See id.* at 924; *see also* Ariz. Rev. Stat. Ann. §§ 36–3709, 36–3713 (Westlaw current through May 3, 2017). When the district court holds a

hearing regarding the change of status after an annual review, the state is required to prove beyond a reasonable doubt that an SVP's mental disorder has not changed or that he or she remains a danger. *Pima Cty.*, 352 P.3d at 924; *see also* Ariz. Rev. Stat. Ann. § 36–3709. However, in the revocation context, the state need only prove by a preponderance of the evidence that the conditionally released person should be committed to "total confinement." *Pima Cty.*, 352 P.3d at 924; *see also* Ariz. Rev. Stat. Ann. § 36–3713(C). The State can do this by demonstrating that the terms of release were violated, additional treatment is necessary, or the community is no longer safe with the person in conditional release. Ariz. Rev. Stat. Ann. § 36–3713(C).

> The court noted
>
> when the issue is revocation of a conditional release, the burden of proof is lower, and the liberty interests Sanchez cites are not implicated because the state has already met the greater burden in establishing his continuing status as an SVP.

*Pima Cty.*, 352 P.3d at 924. The court ultimately found that Sanchez did not meet his burden of demonstrating that the lower standard of evidence in the revocation statute was unconstitutional. *Id.*

In Washington, Wrathall was civilly committed as an SVP and placed in total confinement at a facility on McNeil Island. *In re Det. of Wrathall,* 232 P.3d 569, 570 (Wash. Ct. App. 2010). The court later placed Wrathall into a less restrictive alternative (LRA) at the secure treatment facility on the island. *Id.* Following his noncompliance with treatment and behavioral requirements at the facility, Wrathall's LRA was revoked. *Id.* The next year, he was again granted an LRA and returned to the treatment facility. *Id.* After a number of years at the facility, the director was concerned that Wrathall was not making

treatment progress, so the state moved to modify the conditional release order to substitute a different sex offender treatment provider. *Id.* The district court granted the order and Wrathall began seeing a new treatment provider at the facility. *Id.* During his treatment sessions with the new provider, Wrathall informed her that he disliked being told what to do and if he were unconditionally released to the community, he would "maybe" molest a minor because the rules of his release would tell him not to. *Id.* He also told his treatment provider that the way he would control his mood would be to consume beer, hard alcohol, or drugs, but if those substances did not work, he would "look for a kid." *Id.* His treatment provider reported that Wrathall's behavior indicated he was not willing to participate in treatment and that he was not ready to transition into the community. *Id.* She recommended that his LRA status be removed and that the district court transfer him back to the secure confinement facility. *Id.* The state filed a petition to revoke Wrathall's LRA, which the district court granted. *Id.* at 571. Wrathall appealed and argued that the revocation of his conditional release violated his due process rights because the court did not make a finding that his violations were willful before sending him back to secure confinement. *Id.*

Like Iowa and Arizona, Washington's revocation statute requires a different standard of proof when the district court makes a determination of whether a violation of conditional release occurred. Wash. Rev. Code Ann. § 71.09.098(5)(*c*) (West, Westlaw current through 2016 Reg. & First Spec. Sess.). The state need only demonstrate by a preponderance of the evidence that the committed person violated the terms of conditional release or that the committed person needs additional care, monitoring, supervision, or treatment. *Id.* The state alleged both prongs in its

petition to revoke Wrathall's LRA. *Wrathall*, 232 P.3d at 571. If the court determines the state has met its burden, it may then modify the terms of the conditional release or send the committed person back to the total confinement facility. Wash. Rev. Code Ann. § 71.09.098(7), (8).

The Washington court held that the due process clause does not require the district court to find that a violation is willful before sending a committed person to total confinement under the Washington statute. *Wrathall*, 232 P.3d at 572. The court held

> the State's interest in "protecting society, particularly minors, from a person convicted of raping a child" was rationally served by imposing stringent conditions and greatly outweighed the offender's interest in being punished only for willful conduct, especially given that the offender's rights are already diminished because of his conviction for a sex offense.

*Id.* (quoting *State v. McCormick*, 213 P.3d 32, 38 (Wash. 2009) (en banc)). Although the *McCormick* case dealt with the revocation of a suspended sentence under the Washington special sex offender sentencing alternative, the court of appeals extended the rationale to the sexually violent predator statutes. *Id.* The court held that due process did not require the court to find the violation was willful under the statute when the violation itself created a threat to society. *Id.*

However, some courts do require the state to demonstrate the likelihood of reoffending in order to recommit an individual who has violated the terms of conditional release or conditional discharge. *See, e.g., In re Civil Commitment of E.D.*, 874 A.2d 1075, 1076–77 (N.J. 2005). The New Jersey Supreme Court held that due process requires the state to demonstrate by clear and convincing evidence that an individual continues to be an SVP and that they are likely to reoffend if not

recommitted. *Id.* at 1083. This is the same standard required to civilly commit an individual as a sex offender in the state. *Id.*

The Supreme Judicial Court of Massachusetts found that the legislature intended the district courts to have the power to recommit individuals for breaching the terms of conditional release. *See Commonwealth v. Travis*, 361 N.E.2d 394, 399 (Mass. 1977). However, the court also held that the court would need to find that the person was sexually dangerous to order recommitment. *Id.* ("[T]he recommitment intended by the Legislature appears to be recommitment under the terms of the original commitment, which would necessarily entail a vacation of the prior finding that the individual was no longer sexually dangerous . . . .").

**C. Substantive Due Process as Applied to Anderson.** After the district court determined Anderson violated the terms of his release plan, the district court ordered his confinement at CCUSO's transitional release program. Anderson argues that confining him to CCUSO's transitional release program violated his substantive due process rights because it is not narrowly tailored to his treatment needs and does not bear a substantial relationship to either his liberty interests or the public safety interests of the community. He also argues that it was a general or blanket restriction, and the district court did not properly balance the community interests of having him confined with his liberty interests.

When we determine whether the State has violated substantive due process, we weigh the individual's liberty interest against the State's reason for the restraint on that individual's liberty. *Matlock*, 860 N.W.2d at 904. In *Matlock*, we noted that

> [d]ue process requires the court to properly balance the interest of the community against the liberty interest of a person suffering from a mental abnormality who is not likely

> to engage in acts of sexual violence upon release. To do this, the district court must strike the proper balance between the treatment needs of a person released with supervision and the protection of the public.

*Id.* at 907 (citation omitted).

In the district court's order revoking Anderson's release with supervision plan, the district court found, and Anderson acknowledged, that he had violated the terms of his release plan by having sex without prior approval and by having sex with an inappropriate partner. The district court further found Anderson's testimony that the eighteen-year-old sexual partner was the instigator not credible. It found credible the testimony of Dr. Tatman that Anderson was manipulative, that his choice in a partner was of an underlying sexual nature, and that his behavior was part of a cycle of his past sexual offenses. The district court also gave credit to Dr. Tatman's testimony that Anderson was at a higher risk at the time of the violation and hearing than he was at the time of the jury trial. The district court also noted that confinement in secure custody was not appropriate because Dr. Tatman was unable to say whether Anderson was more likely than not to reoffend. Ultimately, the district court determined the transitional release program was most appropriate because Anderson needed the skills and treatment available to him in the program.

While the district court did not expressly balance the community interests with Anderson's liberty interest, it did engage in a balancing analysis. The district court weighed Anderson's liberty interest when it considered whether secure custody or the transitional release program was appropriate based on his prior behavior and current violation. The district court had three options of placement before it—return to release with supervision, place in the transitional release program, or order to

secure confinement—and it chose to send Anderson to the transitional release program based on the obvious need for additional treatment and the supervision available at the facility. The district court had the option of returning Anderson to the release-with-supervision status at the Fort Des Moines facility instead of the transitional release program. However, because of his choice of an inappropriate partner, the sexual nature of the violation, Anderson's lack of credibility, and the credible testimony of Dr. Tatman, the district court determined the programming available at the transitional release program was better suited to Anderson's needs and the protection of the public.

In its order, the district court expressly considered Anderson's treatment needs. It noted that the jury's verdict resulted in Anderson "skipping over the transitional release program, and intermediate level of custody between secure confinement and community placement." The district court found that Anderson needs the treatment available at the transitional release program that is not available on release with supervision at the Fort Des Moines facility. At least part of the reason the district court ordered Anderson to the transitional release program was because it believed Anderson needed treatment focused on positive relationship skills, which directly relates to the conduct that Anderson engaged in when violating the terms of his release with supervision.

The district court also considered whether modifying Anderson's release-with-supervision plan or sending him back to secure custody were appropriate before concluding that the transitional release program was most suited to his needs. The district court noted that two of the therapists who offered opinions believed Anderson should remain in release with supervision. However, the district court found more persuasive the concern that his violation was sexual in nature and

indicated the need for building positive relationship skills. The district court also noted that secure confinement was not appropriate in Anderson's case because none of the therapists opined that he was more likely than not to reoffend.

Likewise, the court considered Anderson's liberty interest in its order. There is nothing in the statute that requires the State, as part of the revocation of the release with supervision status, to again prove that a person is more likely to sexually reoffend before they can be subject to greater supervision or placed in the transitional release program. *See* Iowa Code § 229A.9B. The district court order transferring Anderson to the transitional release program expressly provides that his progress shall be reviewed one year following the order and be made in accordance with the provisions of Iowa Code section 229A.8. Anderson has retained all the due process rights afforded all civilly committed persons to annual evaluations and annual reviews. *See id.* § 229A.8.

The district court also considered the risk to the public of returning Anderson to release with supervision at the Fort Des Moines facility. Anderson engaged in sexual conduct without permission. When a committed person violates the terms of a release plan, it can result in a heightened danger to the public. This is why when there is an allegation that a violation has occurred, the agency with jurisdiction has the immediate ability to request an emergency ex parte order transferring the committed person to a secure facility. *Id.* § 229A.9B(1). The committed individual is then brought before the district court to determine whether the violation occurred. *Id.* § 229A.9B(3)–(4). If the district court determines that a violation has occurred, then the district court has the discretion to determine what level of release, transitional programming, or commitment is necessary based on the type and severity of the

violation. *Id.* § 229A.9B(3), (5). Additionally, when a committed person violates the terms of a release plan, this indicates that they may no longer be participating in the ongoing treatment anticipated by the release plan that is intended to reintegrate them into society. This is of particular concern when the violation is a sexual offense, as in Anderson's case. Further, Anderson's sexual partner was one that he would not have been granted permission to engage in sexual activity with because his choice of a young and vulnerable partner was part of his sexual offense cycle. Additionally, the Fort Des Moines facility never grants permission for sexual relationships between two participants in the release-with-supervision program.

The district court properly weighed the State's reasons for additional restraint with Anderson's liberty interests. We find the reasoning utilized by the courts in Arizona and Washington persuasive. We conclude that, in the revocation context, the State needs to prove by a preponderance of the evidence that the conditionally released person violated the terms of release, that additional treatment is necessary, and the community is no longer safe with the person in release with supervision. The district court in this case properly balanced each of these competing factors and reached an appropriate decision regarding the level of supervision and control. After this balancing, the district decided on a statutorily allowed option.

It is important to emphasize the two primary factors that inform our decision in this case. First, the district court only substituted one form of conditional release—the transitional release program located at CCUSO—for another form of conditional release—release with supervision. This was based on what the district court found to be the obvious need for greater treatment and supervision that could be

provided at the transitional release program at CCUSO. Most importantly, the district court did not order Anderson back to a secure facility. If that had occurred, it might be necessary to revisit the substantive due process argument as applied to Anderson. But that will have to wait for another case. Under the facts here, we find that the district court order did not violate Anderson's substantive due process rights.

**D.  Procedural Due Process.**  We must also determine whether the statute violated Anderson's right to procedural due process. We have adopted the three-part test set forth by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903, (1976), to determine the process due to an individual deprived of a protected liberty interest. *See State ex rel. Hamilton v. Snodgrass*, 325 N.W.2d 740, 742 (Iowa 1982) (adopting and implementing the *Mathews* balancing test). The three factors from the *Mathews* test that a court must consider in a procedural due process analysis are

> (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Swanson v. Civil Commitment Unit for Sex Offenders*, 737 N.W.2d 300, 308 (Iowa 2007) (quoting *Mathews*, 424 U.S. at 335, 96 S. Ct. at 903).

We have previously found that there is "no constitutional bar to the civil confinement of sexually violent predators with untreatable conditions when confinement is necessary to protect the public." *Id.* (quoting *In re Det. of Darling*, 712 N.W.2d 98, 101 (Iowa 2006)). However,

those individuals do retain a liberty interest in the requirements and procedures contained in chapter 229A. *Id.*

We must analyze the three *Mathews* factors as applied to Anderson. The first factor is "the private interest that will be affected by the official action." *Mathews*, 424 U.S. at 335, 96 S. Ct. at 903. Anderson has a private interest in his own personal liberty. His transfer to the transitional release program at CCUSO curtails his freedom because he had the ability to leave the Fort Des Moines facility without a chaperone. While Anderson is allowed access to the community while he remains in the transitional release program, it is at the sole discretion of staff and with an escort.

The second factor is "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Id.* The risk of an erroneous deprivation of due process with the safeguards contained in Iowa Code section 229A.9B is low. Section 229A.9B provides safeguards before the district court is allowed to modify the terms of a committed person's release with supervision. *See* Iowa Code § 229A.9B. The court must hold a hearing and find that the State proved by a preponderance of evidence a violation has occurred. *Id.* § 229A.9B(4). The court then has the ability to weigh different options and determine which is best based on the violation that occurred. *Id.* § 229A.9B(5).

The final factor that must be considered is "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335, 96 S. Ct. at 903. The State's interest in allowing the court to modify or heighten restrictions after a committed person violates the terms of their release with supervision is high. The

State has an interest in protecting the general public from sexually violent persons and that includes an interest in monitoring behavior and risk factors while those persons are on release with supervision. Here, Anderson's violation was connected to his cycle of offending. It was a sexual offense, demonstrated planning, and Anderson took no responsibility for the encounter.

Anderson's right to procedural due process was not violated when the district court found he violated the terms of his release with supervision and ordered him placed in the transitional release program at CCUSO.

### IV. Conclusion.

The district court order revoking Anderson's release-with-supervision status and placing him at the transitional release program at CCUSO did not violate his substantive or procedural due process rights under either the United States Constitution or the Iowa Constitution. Accordingly, we affirm the decision of the district court.

**AFFIRMED.**

All justices concur except Wiggins, Hecht and Appel, JJ., who dissent.

**WIGGINS, Justice (dissenting).**

I disagree with the majority's conclusion that under the findings made by the district court it had the statutory or constitutional authority to place Jeffrey Anderson in the transitional release program under Iowa Code chapter 229A (2016).

## I.  Absence of Statutory Authority.

Chapter 229A contains the Code provisions concerning civil commitment of sexually violent predators.  The legislature included the transitional release program as part of its civil commitment of sexually violent predators.  Iowa Code § 229A.8A.  Transitional release is the last phase of treatment for persons committed to the civil commitment unit for sexual offenders (CCUSO).  We have previously found the transitional release program is the fifth phase of treatment while committed at CCUSO.  *See Swanson v. Civil Commitment Unit for Sex Offenders*, 737 N.W.2d 300, 303 (Iowa 2007); *see also* Iowa Code § 229A.8A (stating the requirements for a person to be moved to transitional release).

Although section 229A.9B(5) authorizes a judge to place a person who violates the terms of his or her release with supervision in the transitional release program, a judge must make specific findings before doing so.  The first finding a court must make to place a person in the transitional release program at CCUSO is that "[t]he committed person's mental abnormality is no longer such that the person is a high risk to reoffend."  Iowa Code § 229A.8A(2)(*a*).  Implicit in this finding is that the person is still likely to reoffend, but at a lower risk than at the time the person was originally committed to CCUSO.  The district court never made that finding in this case.

Once a court makes an initial finding under section 229A.8A(2)(*a*), the statute requires the court to make the following additional findings in order for a court to commit a person to the transitional release program:

> *b.* The committed person has achieved and demonstrated significant insights into the person's sex offending cycle.
>
> *c.* The committed person has accepted responsibility for past behavior and understands the impact sexually violent crimes have upon a victim.
>
> *d.* A detailed relapse prevention plan has been developed and accepted by the treatment provider which is appropriate for the committed person's mental abnormality and sex offending history.
>
> *e.* No major discipline reports have been issued for the committed person for a period of six months.
>
> *f.* The committed person is not likely to escape or attempt to escape custody pursuant to section 229A.5B.
>
> *g.* The committed person is not likely to engage in predatory acts constituting sexually violent offenses while in the program.
>
> *h.* The placement is in the best interest of the committed person.

*Id.* § 229A.8A(2). In this case, the district court never made these findings before committing Anderson to the transitional release program.

Without these findings for commitment to the transitional release program, the court could order Anderson returned to release with or without supervision. In the alternative, the court could order him to confinement in a secure facility at CCUSO after making the necessary findings to do so. *See id.* §§ 229A.2, .7, .9B(5).

## II. Absence of Constitutional Authority.

In a previous decision, we outlined the requirements of substantive due process when a person's liberty is at stake. There we said,

> Substantive due process prohibits the State from engaging in arbitrary or wrongful acts " 'regardless of the fairness of the procedures used to implement them.' " At the core of the liberty protected by the Due Process Clause is a person's interest to be free from bodily restraint by arbitrary government actions. However, this liberty interest is not absolute.

*In re Det. of Matlock*, 860 N.W.2d 898, 903 (Iowa 2015) (citation omitted) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 983 (1990)). In order to determine whether the State has violated a person's substantive due process, we must weigh the person's liberty interest against the State's asserted reason for restraining that person's liberty. *Id.* at 904.

In the case of a commitment of a sexually violent predator to a secure facility like CCUSO, the United States Supreme Court and our court have found the State can confine a sexually violent predator civilly for treatment as long as a person with a mental abnormality finds "it difficult, if not impossible, for the person to control his dangerous behavior." *In re Det. of Garren*, 620 N.W.2d 275, 284 (Iowa 2000) (quoting *Kansas v. Hendricks*, 521 U.S. 346, 358, 117 S. Ct. 2072, 2080 (1997)). Our legislature has complied with this standard by defining a sexually violent predator as

> a person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality which makes the person likely to engage in predatory acts constituting sexually violent offenses, if not confined in a secure facility.

Iowa Code § 229A.2(12).

We have also discussed the substantive due process rights of a person who the court releases from a civil commitment with supervision. *See Matlock*, 860 N.W.2d at 904–08. A person can be released from a civil commitment as a sexually violent predator if the State *cannot* show

that the committed "person's mental abnormality remains such that the person is likely to engage in predatory acts that constitute sexually violent offenses if discharged." Iowa Code § 229A.8(6)(*d*)(1). In this situation, the court can release a person with or without supervision. *Id.* § 229A.9A. When released, the previously committed person is not under a civil commitment, but only subject to outpatient conditions that "bear a substantial relation to the interests of the individual and the community." *Matlock*, 860 N.W.2d at 908.

In this case, the State released Anderson with supervision, and he violated the conditions the court placed on him while released with supervision. We now must determine if the court violated his substantive due process rights when the court recommitted him to CCUSO's transitional program under chapter 229A of the Code.

The majority uses a *Matlock* due process analysis to find the district court order returning Anderson to CCUSO's transitional release program did not violate his due process rights. In *Matlock*, the court released Matlock with supervision from the transitional release program at CCUSO because the court found that although he still suffered from a mental abnormality, he was not likely to engage in acts of sexual violence upon release. *Id.* at 900. The *Matlock* due process analysis is less stringent than the *Hendricks–Garren* due process analysis because Matlock was no longer committed to the transitional release program at CCUSO. Rather, the court released him from CCUSO with supervision. In situations where the person is no longer committed to CCUSO, due process only requires us "to properly balance the interest of the community against the liberty interest of a person suffering from a mental abnormality who is not likely to engage in acts of sexual violence upon release." *Id.*

On the other hand, due process for persons committed to CCUSO can only be satisfied if

> [t]he precommitment requirement of a "mental abnormality" or "personality disorder" is consistent with the requirements of these other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness.

*Hendricks*, 521 U.S. at 358, 117 S. Ct. at 2080. The flaw in the majority's reasoning is that it fails to acknowledge sending Anderson to the transitional release program at CCUSO is recommitting him to the CCUSO. The majority is wrong and without any legal authority to support its conclusion that "the district court only substituted one form of conditional release—the transitional release program located at CCUSO—for another form of conditional release—release with supervision."

Other states faced with this same situation have agreed with my analysis. In New Jersey, before a court can recommit a person for violating a conditional release, the court must find the person is dangerous because he or she is highly likely to reoffend. *In re Civil Commitment of E.D.*, 874 A.2d 1075, 1076–77 (N.J. 2005). The Supreme Judicial Court of Massachusetts reached the same conclusion. *Commonwealth v. Travis*, 361 N.E.2d 394, 399 (Mass. 1977).

The Arizona and Washington appellate court decisions cited by the majority do not support a conclusion that the court need not afford the *Hendricks–Garren* due process analysis when it recommits a person to CCUSO. The Arizona court of appeals required a finding that before a court could return a person on conditional release to confinement, the state had to prove that the person was dangerous. *In re Pima Cty. Mental Health Cause No. A20020026*, 352 P.3d 921, 924 (Ariz. Ct. App. 2015).

In *Pima County*, the court only held the state could prove dangerousness by a preponderance of evidence, rather than by the higher standard of beyond a reasonable doubt because a conditional release under Arizona law is not a release from the commitment. *Id.*

The Washington appellate court only dealt with whether the state had to prove a willful violation in order to remove a civilly committed sex offender from a less restrictive alternative to commitment. *In re Det. of Wrathall*, 232 P.3d 569, 569 (Wash. Ct. App. 2010). It held the State did not have to prove a willful violation. *Id.* at 572. Notably, in affirming the offender's recommitment, the court found the offender acknowledged he posed a danger to society. *Id.*

Thus, the Arizona and Washington appellate court decisions relied upon by the majority address the standard of proof required for recommitment, not the due process analysis required. The majority cites no authority allowing a court to recommit Anderson to CCUSO's transitional release program without a *Hendricks–Garren* due process analysis. Because the district court did not make the proper *Hendricks–Garren* due process findings, I would remand the case to the district court to determine the proper placement of Anderson, requiring the court to give due consideration to the statutory and due process requirements that must be afforded to him.

Hecht and Appel, JJ., join this dissent.