# IN THE COURT OF APPEALS OF IOWA

No. 18-0421
Filed November 6, 2019


**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**KENNETH CURTIS SHAW,**
        Defendant-Appellant.
_____


        Appeal from the Iowa District Court for Polk County, Paul D. Scott, Judge.


        Kenneth Shaw appeals his conviction and sentence for first-degree robbery in violation of Iowa Code sections 711.1 and 711.2 (2017). **AFFIRMED ON CONDITION AND REMANDED WITH DIRECTIONS.**


        Mark C. Smith, State Appellate Defender, (until withdrawal), and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.


        Considered by Potterfield, P.J., and Tabor and Greer, JJ.

**POTTERFIELD, Presiding Judge.**

Kenneth Shaw appeals his conviction and sentence for first-degree robbery in violation of Iowa Code sections 711.1 and 711.2 (2017). Shaw was sentenced to a twenty-five year prison sentence, with 70% mandatory incarceration. On appeal, Shaw argues: (1) the State did not provide sufficient evidence to show Shaw committed the robbery at issue; and (2) the jury pool was not a fair cross-section of the community in violation of his rights under the Sixth Amendment to the United States Constitution and Article I, section 10 of the Iowa State Constitution.

## I. Factual Background and Proceedings

This appeal relates to the March 1, 2017 robbery of Check Into Cash, a payday loan company. Around 6 that day, the store manager Nicholas Harvey was on the phone when a man entered the store and approached the counter. The man requested Harvey break a ten dollar bill for him. When Harvey opened the till to retrieve one dollar bills, the man pulled out a pistol and pointed it at him. Harvey backed away from the till. The man came around to Harvey's side of the counter, grabbed the removable tray from the till, and threw the till on the floor. He grabbed the money from the floor then left the store.

Once the man left, Harvey ran to the back of the store and hit a panic button that called the police. Once the police arrived, Harvey identified the robber as Shaw. Harvey had helped Shaw open an account and apply for a loan at Check Into Cash in January and recognized him when he entered the store. Harvey told the police what had happened and gave them a customer information sheet Shaw had filled out when he applied for the loan. The

customer information form included Shaw's cellphone number, social security number, and a photocopy of Shaw's driver's license.

The Des Moines Police Department assigned the case to Officer Brad Youngblut. Officer Youngblut created a six-person photo lineup, which included Shaw and five other men similar in appearance to Shaw, and presented the lineup to Harvey. Harvey identified Shaw as the perpetrator "[f]airly immediately." Officer Youngblut was eventually able to contact Shaw on March 5, through the phone number Shaw had given Harvey. Shaw told Officer Youngblut he was currently in Milwaukee and had been there at the time of the robbery. Officer Youngblut asked Shaw to provide him with any physical proof that he was presently in Milwaukee, but Shaw indicated he could not.

After finishing the call, Officer Youngblut obtained a subpoena for Shaw's cellphone records. The records showed Shaw had returned his call from the Des Moines area, in the vicinity of both Shaw's home and Check Into Cash. The records also showed Shaw was around the same area on the day of the robbery. Officer Youngblut called Shaw back and confronted him with this information. Shaw either ended the call or was disconnected and would not answer Officer Youngblut's subsequent attempts to contact him.

A warrant was issued for Shaw's arrest, and he was taken into custody on April 18, after he was pulled over for a routine traffic stop. Shaw was charged with first-degree robbery and pled not guilty. Jury selection was scheduled for February 21, 2018, with the trial to begin the next day. Shaw moved to dismiss the jury pool, arguing the panel did not represent "a cross-section of the community and a fair racial makeup" under the Iowa Supreme Court's decision in

*State v. Plain*, 898 N.W.2d 801 (Iowa 2017). Only one of the forty-four jurors—2.3% of the jury pool—identified as African American, despite African Americans making up 6.8% of the population of Polk County, from which the jury pool was drawn.[1] Two other jurors did not identify their race. The trial court ultimately denied the motion, noting that because over 25% of jurors called in Polk County in 2017 (the most recent data available) declined to specify their race, "[t]here was simply no way for the Court to make the determination that there is a systematic underrepresentation of African Americans in our jury pool."

Shaw was found guilty of first-degree robbery and sentenced to a twenty-five year prison sentence. He appeals.

## II. Standard of Review

"We review constitutional issues de novo." *State v. Lilly*, 930 N.W.2d 293, 298 (Iowa 2019). We review sufficiency of the evidence for corrections of errors of law. *Id.*; Iowa R. App. P. 6.907. "Under this standard, we will affirm when the verdict is supported by substantial evidence." *State v. Banes*, 910 N.W.2d 634, 637 (Iowa 2018). "Evidence is substantial when the quantum and quality of evidence is sufficient to "convince a rational fact finder that the defendant is guilty beyond a reasonable doubt.'" *Id.* (quoting *State v. Webb*, 648 N.W.2d 72, 76 (Iowa 2002)). "In making determinations regarding the sufficiency of the evidence, we 'view the evidence in the light most favorable to the state, regardless of whether it is contradicted, and every reasonable inference that may be deduced therefrom must be considered to supplement that evidence.'" *Lilly*, 930 N.W.2d at 298 (quoting *State v. Harris*, 891 N.W.2d 182, 186 (Iowa 2017)).

---

[1] The parties do not dispute this statistic on appeal.

### III. Discussion

#### a. Sufficiency of Evidence

Shaw argues the State provided insufficient evidence to convict him of first-degree robbery. The State argues sufficient evidence was introduced. We agree with the State.

In essence, Shaw argues insufficient evidence was introduced to identify him as the robber. He points to discrepancies between Shaw's appearance and the description of the robbery Harvey gave to the police. Shaw notes Harvey initially described the robber as having acne scars on his forehead—which Shaw does not have—and no facial hair, then saying at his deposition that the perpetrator, like Shaw, had a goatee. These and other discrepancies, Shaw argues, "give rise to a reasonable doubt" about the reliability of Harvey's testimony.

Viewing the evidence in the light most favorable to the State, there is sufficient evidence to support Shaw's guilty verdict. When reviewing a sufficiency-of-the-evidence challenge, "we do not resolve conflicts in the evidence, pass upon the credibility of witnesses, or weigh the evidence." *State v. Hutchison*, 721 N.W.2d 776, 780 (Iowa 2006). The jury was entitled to consider Harvey's testimony and give it the weight it felt appropriate. Furthermore, Harvey's identification of Shaw as the perpetrator is supported by the video evidence of the robbery and the day Shaw opened an account at Check Into Cash, and his dishonesty to Officer Youngblut about his location on the day of the robbery, which Youngblut testified to at trial. *State v. Odem*, 322 N.W.2d 43, 47 (Iowa 1982) ("A false story told by a defendant to explain or deny a material

fact against him is by itself an indication of guilt."). A rational jury could view this evidence and believe the videos and Youngblut's testimony identified Shaw as the perpetrator.

### b. Composition of Jury Pool

Shaw also challenges the composition of his jury pool. He argues his jury pool failed to represent a fair cross-section of the community in violation of both the United States Constitution and the Iowa State Constitution. Because Shaw has not identified a separate framework to analyze a challenge to the jury's racial composition under the Iowa State Constitution, we will analyze both claims under the federal framework. *See In re Det. of Anderson*, 895 N.W.2d 131, 139 (2017) ("When a party does not suggest a framework for analyzing the Iowa Constitution that is different from the framework utilized under the United States Constitution, we apply the general federal framework. However, we reserve the right to apply the federal framework in a different manner.").

The Sixth Amendment to the United States Constitution guarantees criminal defendants "the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. This right "entitles the criminally accused to a jury drawn from a fair cross-section of the community." *Plain*, 898 N.W.2d at 821. Under *Plain* and the United States Supreme Court's decision in *Duren v. Missouri*, 439 U.S. 357 (1979), a defendant can establish a prima facie violation of the fair-cross-section requirement by showing:

> (1) that the group alleged to be excluded is a ''distinctive'' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation

to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Plain*, 898 N.W.2d at 822 (quoting *Duren*, 439 U.S. at 364). Applying *Plain*, the district court took "judicial notice of the fact that Mr. Shaw is an African-American" and noted "I think we can all agree that African Americans are a distinctive group in this community." The State does not dispute that this prong of *Plain*/*Duren* test has been met.[2]

We skip over the second prong to address the third prong, which requires a defendant "establish that systematic exclusion of the group caused the underrepresentation of the group." *Plain*, 898 N.W.2d at 823. "To establish

---

[2] The State concedes that African Americans are a distinct group within the meaning of *Plain*/*Duren*, but it spends most of its brief addressing the principle Shaw need not be part of a distinct group himself to challenge the racial composition of juries. The Iowa Supreme Court said in *Plain*:

> a defendant must establish membership in a distinctive group under community standards meaning a community group with "a definite, objectively ascertainable membership" that "constitutes a substantial segment of the population" and has "common and unique opinions, attitudes, and experiences" that cannot be adequately represented by members of the general population.

*Id.* (citing Thomas M. Fleming, Age Group Underrepresentation in Grand Jury or Petit Jury Venire, 62 A.L.R. 4th 859, 867 (1988)). "In other words, a defendant must show she has 'characteristics that are relevant to constituting a jury venire that is representative of the community.'" *Id.* (quoting David M. Coriell, Note, *An (Un)fair Cross Section: How the Application of Duren Undermines the Jury*, 100 Cornell L. Rev. 463, 480 (2015)). While *Plain* is binding precedent on us, the State correctly identifies that this assertion is contradicted by the United States Supreme Court's Sixth Amendment precedent. *See Holland v. Illinois*, 493 U.S. 474, 477 (1990) ("We have never suggested, however, that such a requirement of correlation between the group identification of the defendant and the group identification of excluded venire members is necessary for Sixth Amendment standing. To the contrary, our cases hold that the Sixth Amendment entitles every defendant to object to a venire that is not designed to represent a fair cross section of the community, whether or not the systematically excluded groups are groups to which he himself belongs."); *Duren*, 439 U.S. at 364 (concluding the first prong has been met where a male defendant challenges the exclusion of female jurors from the jury pool).

systematic exclusion, a defendant must establish the exclusion is 'inherent in the particular jury-selection process utilized' but need not show intent." *Id.* at 824 (quoting *Duren*, 439 U.S. at 366).

On appeal, Shaw argues African Americans are systemically excluded from the jury selection process, but does not point to any specific fault or practice causing the exclusion apart from the process's failure to use "additional comprehensive source lists" when selecting jurors. Shaw does not point to evidence demonstrating how these practices caused the systematic underrepresentation of African Americans in the jury pool. Because Shaw has failed "to show causation, that is, that underrepresentation is produced by some aspect of the system," he has not established a fair-cross-section claim under the Sixth Amendment or Article I, section 10 based on the record.

That being said, we note that, while Shaw's appeal was pending, the Iowa Supreme Court decided *State v. Lilly*, 930 N.W.2d 293 (Iowa 2019), and *State v. Veal*, 930 N.W.2d 319 (Iowa 2019), which together clarified the second[3] and third[4] prongs of the fair-cross-section analysis. Because Shaw did not have the

---

[3] The court approved the use of the standard deviation test to demonstrate the jury pool did not fairly and reasonably represent a cross-section of the community, and adopted different statistical standards to show underrepresentation under the Iowa Constitution and United States Constitution. *See Lilly*, 930 N.W.2d at 301–02, 304 (holding a defendant establishes the second prong of *Plain*/*Duren* under Article I, section 10 by showing the percent of the group in the jury pool is "one standard deviation or more below its percentage in the overall population of eligible jurors); *Veal*, 930 N.W.2d at 329 (requiring "a downward variance of two standard deviations" to meet the second prong of *Plain*/*Duren* under the Sixth Amendment).

[4] The court determined standard jury management practices could constitute systematic exclusion under the Iowa Constitution, but something more than a "laundry list" of practices is needed to show exclusion under the United States Constitution. *See Lilly*, 930 N.W.2d at 308 ("[W]e hold today that run-of-the-mill jury management practices such as the updating of address lists, the granting of excuses, and the enforcement of jury summonses can support a systematic exclusion claim where the evidence shows

benefit of either *Lilly* or *Veal*'s refinements, we remand the matter to the district court to give Shaw an opportunity to develop his arguments that his constitutional right to an impartial jury was violated; if the court finds a violation occurred, it shall grant Shaw a new trial.  *See Lilly*, 930 N.W.2d at 308; *Veal*, 930 N.W.2d at 330; *State v. Williams*, 929 N.W.2d 621, 630 (Iowa 2019).

We affirm the district court on Shaw's sufficiency of the evidence claim.

**AFFIRMED ON CONDITION AND REMANDED WITH DIRECTIONS.**

---

one or more of those practices have produced underrepresentation of a minority group."); *Veal*, 930 N.W.2d at 329 (requiring "something other than the 'laundry list'" of practices identified by the U.S. Supreme Court in *Berghuis v. Smith*, 559 U.S. 314 (2010) to meet the third prong of *Plain/Duren* under the Sixth Amendment); *see also Berghuis*, 559 U.S. at 332 ("[Respondent]'s list includes the County's practice of excusing people who merely alleged hardship or simply failed to show up for jury service, its reliance on mail notices, its failure to follow up on nonresponses, its use of residential addresses at least 15 months old, and the refusal of [local] police to enforce court orders for the appearance of prospective jurors.").