# IN THE COURT OF APPEALS OF IOWA

No. 19-0494
Filed June 17, 2020

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**CURTIS CORTEZ JONES,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Johnson County, Lars G. Anderson, Judge.

A defendant challenges his conviction for murder in the first degree.

**AFFIRMED ON CONDITION AND REMANDED WITH DIRECTIONS.**

Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Benjamin Parrott, Assistant Attorney General, for appellee.

Heard by Tabor, P.J., and May and Greer, JJ.

**TABOR, Presiding Judge.**

Curtis Cortez Jones represented himself at his trial for first-degree murder. The jury found him guilty. He now appeals, claiming the district court did not ensure his waiver of counsel was knowing, voluntary, and intelligent. He also asks for a conditional remand so he can develop his argument that the State violated his Sixth Amendment right to an impartial jury. Viewing the record in its totality, we find the district court's inquiry of Jones was adequate to protect his rights. But we remand his claim that the jury did not represent a fair cross section of the community for further development under new case law from our supreme court.

## I.      Facts and Prior Proceedings

Jonathan Wieseler's fiancée found his body at the Lederman Bail Bonds office, where he worked. He met an after-hours customer the night of April 22, 2017, but did not come home. Uncharacteristically, Wiesler did not return his fiancée's calls. The next morning, she found him face down on his office floor, shirtless, and covered in blood. She could not find a pulse and called 911. A first responder described the scene as "a gory mess." An autopsy revealed Wieseler had been beaten and shot three times in the head, and his throat was slit.

The night before, a customer called asking for help to bond her sister out of the Johnson County jail. The customer arranged to meet Wieseler at his office. Before the bondsman arrived, she saw a man later identified as Jones. She described him as "antsy" and thought he was trying to enter the building. Jones engaged her in conversation about the amount of her sister's bail and claimed he too was looking for a bondsman. But when Wieseler arrived, Jones left without even making eye contact with him. The customer did not see Jones again.

Her attention turned to paying Wieseler $500, ten percent of her sister's $5000 bond. After satisfying the surety, she and Wieseler went to bail out her sister. The jail's external surveillance cameras captured footage of Wieseler and the two women leaving around 10:15 p.m.[1] As Wieseler reached his parked car, the video showed a man matching Jones's description approach from a vacant lot. The men spoke for a few minutes before walking into the Lederman office. Around 10:30 p.m., as he returned from studying at the library, a university student who lived in an apartment next door saw the man identified as Jones leave the Lederman office. After the murder, Lederman's operations manager discovered $1300 missing from the office, including the $500 in cash the customer had deposited with Wieseler to secure her sister's release.

No arrest occurred that spring. But in the summer of 2017, police investigating a car accident in Washington, Iowa, uncovered clues. Inside a totaled Chevy Malibu, investigators found suspected blood and biological material. A swab sent for testing showed contributions from the DNA profiles of both Jones and Wieseler.

It is here that the investigation of Wieseler's killing converges with a second murder in Iowa City. That is, the June 27, 2017 robbery and shooting death of cab driver Ricky Lillie. According to the minutes of testimony, the similarities between the two murders caused investigators to revisit the surveillance video from April

---

[1] The State also offered video from surveillance cameras on area businesses that showed a person matching Jones's description driving his girlfriend's white Chevy Malibu near the jail around 9:30 that night.

22, looking for the Chevy Malibu.  In a June 30, 2017 interview, police questioned Jones about both crimes.

Relevant to Jones's motion to suppress, the district court offered this timeline of the two events:

- o June 30, 2017—Jones is arrested on an unrelated theft charge in Mount Pleasant, Iowa. Law enforcement questioned Jones about the murders of both Lillie and Wieseler.  At the tail end of the interview, Jones told law enforcement, "Next time you come, bring my lawyer with you" . . . .

- o July 20, 2017—Jones is arrested for the death of Ricky Lillie.

- o July 21, 2017—Counsel is appointed to represent Jones in [Lillie] case.

- o November 20, 2017—Jones is arrested for the death of Wieseler and charged in this case. He is again interviewed by law enforcement.  Counsel is not present.

The district court agreed to suppress statements Jones made after his invocation of the right to counsel.

A limited amount of information appears in this record about Lillie's murder. In response to the defense motion in limine, the State agreed not to discuss that case during this trial on the killing of Wieseler.  But the record does include a defense motion for change of venue that mentions "extensive media coverage" related to Jones going to trial on a different murder charge.  The motion asks the district court to take judicial notice of the order granting a change of venue to Scott County in the Lillie murder prosecution.  The same two attorneys, Douglas Davis and Nekeidra Tucker, represented Jones in the Lillie case.  The court transferred venue in this second murder trial to Polk County.

Before the January 2019 trial, defense counsel filed a motion asking for "an order requiring necessary remedial measures" to ensure his jury pool represented a fair cross-section of the community, citing *State v. Plain*, 898 N.W.2d 801 (Iowa 2017). The motion sought a "fair and reasonable representation of African American jurors, Hispanic jurors, Asian jurors, and non-White jurors" on Jones's jury venire. The State resisted the *Plain* motion.

In a pretrial hearing, the court addressed the fair-cross-section issue. Attorney Davis asserted Jones's jury pool and panel were not "a fair cross-representation" because of the "underrepresentation of the African-American community." Relying on the data, counsel argued there was no reason to believe "there is not some type of systematic exclusion of the African-American group based on those numbers." The court denied the motion.

After jury selection, Attorney Davis informed the court that Jones wished to represent himself. Davis explained Jones wanted "a hybrid representation of sorts" where counsel would continue to provide technical support. But if that wasn't possible, Jones wanted to waive his right to counsel. The district court engaged Jones in a colloquy. The court denied the request for hybrid representation. Jones confirmed he still wanted to represent himself. So the court appointed Davis and Tucker as standby counsel. Jones represented himself through the trial.

The State called more than twenty witnesses. Jones called none. He also decided not to testify in his own defense after the court informed him that the State might be able to impeach him with his recent murder conviction. As he had done in his first trial, Jones asked the court not to submit any lesser-included-offense alternatives to the jury. As the court clarified with Jones, "then the jury only has

one choice and that is to either convict you or acquit you on the charge of Murder in the First Degree." Jones confirmed that he understood the choice. Jones also confirmed he knew a conviction of first-degree murder "carries with it a lifetime in prison without the chance of parole."

The jury found Jones guilty. And the jurors answered two special interrogatories. All twelve jurors believed Jones was guilty of both premeditated murder and felony murder while participating in first-degree robbery.

Jones now appeals. He raises two issues: (1) the adequacy of the court's colloquy on his desire to waive his right to counsel and (2) the treatment of his fair cross-section jury pool claim.

## II.    Scope and Standards of Review

We review both issues de novo because they implicate the Sixth Amendment.[2]  *See Plain*, 898 N.W.2d at 810; *State v. Rater*, 568 N.W.2d 655, 657 (Iowa 1997). For the waiver issue, Jones also relies on article I, section 10 of the Iowa Constitution.[3]  Because Jones does not argue for a separate analysis under

---

[2] That amendment guarantees:
> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI.

[3] That section provides:
> In all criminal prosecutions, and in cases involving the life, or liberty of an individual the accused shall have a right to a speedy and public trial by an impartial jury; to be informed of the accusation against him, to have a copy of the same when demanded; to be confronted with

the Iowa Constitution, we apply the general federal framework. *See In re Detention of Anderson*, 895 N.W.2d 131, 139 (Iowa 2017) (noting our supreme court nonetheless reserves the right to "apply the federal framework in a different manner").

### III. Analysis

### A. Did the district court ensure Jones's waiver of counsel was knowing, voluntary, and intelligent?

When facing a criminal trial, defendants possess both the right to counsel and the right to represent themselves. *See Faretta v. California,* 422 U.S. 806, 807 (1975). The right to counsel remains in effect until the defendant waives it. *Rater*, 568 N.W.2d at 658. In other words, before the right to self-representation attaches, defendants must elect to proceed without counsel by a knowing, intelligent, and voluntary waiver of their right to counsel. *Faretta,* 422 U.S. at 835–36. A request to proceed without counsel must be clear and unequivocal. *Id.* The State bears the burden to prove a valid waiver. *Rater*, 568 N.W.2d at 660.

No question, Jones made a clear request to proceed without his attorneys. True, he preferred hybrid representation. But when the court declined that arrangement, he did not equivocate in his desire to waive counsel. Jones told the judge, "[A]s far as me representing myself, I'm fully capable of doing that."

After Jones asked to forgo counsel, the district court had a duty to determine whether his waiver was competent and intelligent. *See State v. Cooley*, 608 N.W.2d 9, 15 (Iowa 2000).

---

the witnesses against him; to have compulsory process for his witnesses; and, to have the assistance of counsel.
Iowa Const. art. I, § 10.

> To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.

*Id.* (citing *Von Moltke v. Gillies*, 332 U.S. 708, 724 (1948)).

The court also had the responsibility to ensure Jones understood the obstacles inherent in self-representation. *See id.* at 16. Engaging in a so-called *Faretta* colloquy allows the record to show the accused comprehended the pitfalls of self-representation and still chose to go ahead. *See State v. Martin*, 608 N.W.2d 445, 450 (Iowa 2000) (citing *Faretta*, 422 U.S. at 835). What does the court need to ask the defendant? Our supreme court has endorsed the following colloquy:

> (1) Have you ever studied law?
> (2) Have you ever represented yourself or any other defendant in a criminal action?
> (3) You realize, do you not, that you are charged with [first-degree murder].
> (4) You realize, do you not, that if you are found guilty of the crime charged . . . the court could sentence you to [life in prison].
> (5) You realize, do you not, that if you represent yourself, you are on your own? I cannot tell you how you should try your case or even advise you as to how to try your case.
> (6) Are you familiar with the Rules of Evidence? You realize, do you not, that the Federal Rules of Evidence govern what evidence may or may not be introduced at trial and, in representing yourself, you must abide by those rules?
> (7) Are you familiar with the Rules of Criminal Procedure? You realize, do you not, that those rules govern the way in which a criminal action is tried in federal court?
> (8) You realize, do you not, that if you decide to take the witness stand, you must present your testimony by asking questions of yourself? You cannot just take the stand and tell your story. You must proceed question by question through your testimony.
> (9) I must advise you that in my opinion you would be far better defended by a trained lawyer than you can be by yourself. I think it is unwise of you to try to represent yourself. You are not familiar with the law. You are not familiar with court procedure. You are not familiar with the rules of evidence. I would strongly urge you not to try to represent yourself.

(10) Now, in light of the penalty that you might suffer if you are found guilty and in light of all of the difficulties of representing yourself, is it still your desire to represent yourself and to give up your right to be represented by a lawyer?

(11) Is your decision entirely voluntary on your part?

*See id.* at 450 (citing *Spencer v. Ault*, 941 F. Supp. 832, 843–44 (N.D. Iowa 1996)).

This colloquy is a helpful model, but need not be delivered word for word. *See Iowa v. Tovar*, 541 U.S. 77, 88 (2004) (rejecting notion that supreme court has "prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel"); *State v. Spencer*, 519 N.W.2d 357, 360 (Iowa 1994) (explaining Iowa courts "look to the record as a whole to determine whether the defendant desired to be represented by counsel").

Here, the court engaged Jones in the following exchange:

THE COURT: Mr. Jones, I'm just going to ask you a couple questions and, you know, I'm not denigrating you or anything. These are standard questions I would ask anybody who would want to represent themselves. Sir, have you ever studied law? A: No.

Q: Have you ever, prior to this case or prior to now, ever represented yourself in a criminal action? A: No, I haven't.

Q: All right. And you understand, I believe, fully the charge that you are charged with, murder in the first degree, you understand that if you are convicted of that offense, it carries with it a mandatory life imprisonment? There is also a requirement that you pay $150,000 in restitution. Do you understand those penalties? A: Yes, I do.

Q: And you realize that if you are representing yourself, either by yourself or in some sort of hybrid arrangement, you are on your own? I can't give you any legal advice as to how you should proceed or how you should try your case. Do you understand that? A: Yes.

Q: And your attorney has indicated that you have some familiarity with the Iowa Rules of Evidence. Do you believe you are familiar with the Iowa Rules of Evidence? A: Yes, I mean, enough to, you know, navigate my way through, I guess.

Q: Well, those rules govern the way—the Iowa Rules of Evidence along with the Iowa Rules of Criminal Procedure govern the way one—how a trial works, and then the Rules of Evidence govern, you know, how evidence is admitted and when evidence may be admitted and when it may not be admitted, and you are on your

own with respect to those so if you don't object to something that could have been objected to, it's coming in. Do you understand that? A: Yes.

Q: The other thing you need to understand if you are representing yourself, either by yourself or in some sort of co-counsel capacity—well, clearly if you are representing yourself, you are not going to be able to complain about anything later on down the road. So if you were convicted and evidence comes in on your watch, not your attorneys', or something happens on your watch, not your attorneys', that you failed to take action on or did take action on but it was the inappropriate action, you are not going to be able to complain about that. Do you understand that? A: Yes.

Q: Also, I'm not sure what decision you are going to make as far as you testifying, but if you—if you are representing yourself and you choose to take the witness stand, you are going to need ask yourself questions. This isn't going to be a situation where you get to get up here and just take the witness stand and, you know, go into a stream of consciousness, but basically you can't get up here and tell your version or tell your story about what happened. You would have to ask yourself questions just like any other witness would be asked questions. Do you understand that? A: Yes.

Q: And also I want to make it clear to you that you would be expected to follow all rules of procedure just as if you were an attorney practicing in court. So, you know, if there is—you are doing something that's objectionable and counsel for the State objects and I sustain that objection, you are going to have to follow through and— you know, for example, if you are trying to admit an exhibit and you are not doing it right and they object, then I'm going to sustain that objection, and it's going to be up to you to figure out how to admit whatever exhibit you want to have admitted. Do you understand that? A: Yes.

Q: Mr. Jones, especially with a case of this magnitude—I mean, generally my view for almost every case and especially in a case of this magnitude and with the details and information that I'm aware of, I believe anybody in your situation, and particularly you based on the specifics that I know about in this case, is going to be better defended by a trained lawyer than you would be representing yourself. I think it's unwise and foolish of you to represent yourself. You are not familiar with the law; you are not familiar with the Court procedures; you're not familiar with the Rules of Evidence; and I would strongly urge you to rely on your appointed counsel to represent you.

The district court then asked Jones if, after considering all those issues, he still wanted to represent himself. Jones answered: "Yes, if I can have my hybrid."

After discussions with counsel, the court rejected the request for hybrid counsel. Then the court clarified with Jones that he still wished to represent himself. Jones twice confirmed that he did. The court asked if anybody was pressuring him to waive counsel. Jones said no. The court asked if the decision was voluntary. Jones said yes. The court then accepted Jones's waiver of counsel.

After the first day of testimony, the court made additional record outside the presence of the jury, noting,

> [I]t's no secret to those of us here that Mr. Jones, in November, I believe, went through a trial on a similar charge and so he's been sentenced on that charge, and so the fact that he recently went through that trial, obviously is aware of the penalties, what's involved in a trial, that went into my decision—that factored into my decision that his decision to represent himself today was—or proceeding is a knowing and voluntary decision.

On appeal, Jones alleges the district court's colloquy was "deficient in several respects." He lists five omissions: (1) no warning of the unavailability of parole; (2) no mention of possible lesser included offenses; (2) no discussion of possible defenses or mitigating circumstances; (3) no inquiry whether Jones had reviewed the trial information or minutes of testimony or generally about his participation in the development of his case; and (4) no question about the two murder alternatives charged. He also complains the court did not ask if he was under the influence of alcohol or controlled substances, or about any history of mental health conditions. Finally, Jones contends the court should have asked if anyone had made threats or promises to influence his decision.

Out of the gate, the State contends the record leaves no doubt Jones's decision was voluntary. Both Jones and his attorney confirmed nobody pressured Jones to waive counsel. Yet Jones disagrees the record reveals a voluntary

waiver. At oral argument, his attorney linked a voluntary election to the thoroughness of the court's inquiry.

We agree the notion of voluntariness is tied to the knowing-and-intelligent standard, though each concept has its own meaning. A waiver inquiry "has two distinct dimensions." *Cf. Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (discussing waiver of right to remain silent). It must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* And it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 382–83. A waiver meets the definition of "intelligent" if the defendant "knows what he is doing and his choice is made with eyes open." *Tovar*, 541 U.S. at 88.

As for the first dimension, the record shows Jones decided to proceed without an attorney freely and with no intimidation, coercion, or deception. Attorney Davis dispassionately shared his client's wish to represent himself. And Jones repeatedly confirmed that was his desire. He agreed waiving counsel was his "own voluntary decision."

As for the second dimension of a voluntary waiver, we must decide whether Jones possessed the information necessary to make an intelligent decision. The State cites *Tovar* for the proposition that the necessary information to secure an "intelligent election" depends on "a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." 541 U.S. at 88.

Attorney Davis—who just finished representing Jones in the Lillie murder trial—described his client as "knowledgeable and mature enough to make this

decision on his own." Indeed, Jones was forty-two years old at the time of Wieseler trial. He was a high-school graduate. It was evident from his conversation with the judge that he had a solid command of the English language. In the State's view, the "weightiest" factor for us to consider is Jones's recent experience of being tried and convicted for first-degree murder. The State insists that exposure prepared him to be "acutely, uniquely, aware of the nature of the proceedings and the possible punishments."[4]

We realize a defendant's "professed familiarity with the justice system" will not replace an appropriate dialogue with the court about the usefulness of an attorney. *See Cooley*, 608 N.W.2d 16; *see also State v. Stephenson*, 608 N.W.2d 778, 782 (Iowa 2000) (holding "trial court has an absolute duty to indulge the accused in an on the record colloquy"). But here, Jones had the best of both worlds. The district court conducted a thorough give-and-take with Jones, hitting all the high points from the model colloquy commended by our supreme court. The missing information flagged by Jones on appeal was either non-essential or supplied by Jones's experiences.

Let's start with the information about the unavailability of parole. Here, the court told Jones that first-degree murder carried "mandatory life imprisonment."

---

[4] Jones argues that heavy reliance on the first murder case is unwarranted because most of his experience there was not incorporated into this record. As discussed above, the minutes of evidence, the suppression record, the change of venue motion, and the discussion of jury instructions on lesser included offenses all mentioned the Lillie case. And the district court found on the record it was "no secret" to the attorneys that Jones went through a trial on a similar murder charge in November 2018 and was recently sentenced for that offense. We consider these references as part of the totality of circumstances in determining whether the waiver of counsel was knowing, voluntary, and intelligent.

We find that adequate to inform Jones of the length of the prison sentence he faced. Granted, it may have been more illuminating to specify that Jones would never be eligible for parole if convicted of first-degree murder. But he had that information from his recent sentencing in the Lillie case.

Turning to the other missing information, Jones cites no authority for the position that a valid waiver of counsel invariably must come with specific warnings about lesser included offenses, possible defenses, elements of the charges, and mitigating circumstances. Federal courts have not enshrined such a list of essential points that trial judges must convey to the accused before accepting a waiver of counsel. *See United States v. Miller*, 728 F.3d 768, 774 (8th Cir. 2013). The Sixth Amendment does not require a "scripted admonishment" before defendants are allowed to represent themselves. *See Tovar*, 541 U.S. at 92. Rather, a valid waiver will depend on the particular facts of each case. *Id.* The record here shows Jones was involved in the development of the case, attending many depositions before asking to proceed without counsel. The record also shows he understood the charges against him and attacked the forensic evidence as his theory of defense. These circumstances do not suggest Jones required additional information to validly waive counsel.

When we look at the entire record, and the comprehensive conversation the district court had with Jones, we find the court properly determined Jones's waiver of his right to counsel was knowing, voluntary, and intelligent. *See State v. Hartsfield*, No. 00-1686, 2002 WL 21933, at *2 (Iowa Ct. App. Jan. 9, 2002) ("The record is clear the court carefully followed the inquiry that our supreme court

recommended when faced with a defendant who wishes to proceed pro se.").  We decline to reverse on this issue.

**B.    Is Jones entitled to a remand to have the district court reconsider his *Plain* motion under more recent case law?**

The Sixth Amendment guarantees an impartial jury drawn from a fair cross-section of the community.  *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975).  To establish a prima facie violation of that right, an accused must present sufficient evidence to meet a three-part test:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979); *Plain*, 898 N.W.2d at 821–22 (holding modified by *State v. Lilly*, 930 N.W.2d 293 (Iowa 2019)).

In January 2019, Jones filed a motion citing *Plain*.  Addressing the first *Duren* prong, the motion anticipated underrepresentation "of African Americans, Hispanics, and non-Whites" in his jury pool.  On the second prong, the motion recognized that *Plain* examined underrepresentation through three metrics: absolute disparity, comparative disparity, and standard deviation (also called a Z-score).  898 N.W.2d at 822.  On the third prong, the motion alleged that systematic exclusion could be shown by a pattern of unfair underrepresentation.  Attached to

the motion was an exhibit describing jury pool data for Polk County from May through November 2018. The motion relied only on the Sixth Amendment.[5]

The district court heard arguments on the *Plain* motion before jury selection. The parties agreed the court could consider an updated exhibit that included specific information about the pool and panel here.[6] After reviewing that data, the district court denied the *Plain* motion. The court reasoned that the statistics were based on questionnaires where about one-third of the potential jurors declined to identify their race. Without that information, the court could not find either an unfair representation or a systematic exclusion.

On appeal, Jones stresses he did not have the benefit of our supreme court's refinements to *Plain*—announced in a trio of cases issued in May 2019. *See Lilly*, 930 N.W.2d at 304–08; *State v. Veal*, 930 N.W.2d 319 (Iowa 2019); *State v. Williams*, 929 N.W.2d 621 (Iowa 2019). In *Lilly*, the court held neither absolute disparity nor comparative disparity is an accepted statistical method for determining whether minority representation is "fair and reasonable in relation to the number of such persons in the community." 903 N.W.2d at 302. Instead, *Lilly* held the standard-deviation method is appropriate. *Id. Lilly* further decided the threshold for a state constitutional claim under the second *Duren* prong should be one standard deviation from the norm. *Id.* at 304. "[I]n other words, the percentage

---

[5] In *Lilly*, the defendant "brought his challenge under both the Sixth Amendment and article I, section 10 of the Iowa Constitution, which like the Sixth Amendment provides a right to trial before 'an impartial jury.'" 930 N.W.2d at 300.
[6] By statutory definitions, "pool" refers to the jurors summoned to the courthouse for a particular time; "panel" refers to the jurors summoned to a particular courtroom to serve, potentially, on a jury for a specific trial. *See* Iowa Code § 607A.3(7), (9); *Lilly*, 930 N.W.2d at 299 n.2.

of the group in the jury pool must be one standard deviation or more below its percentage in the overall population of eligible jurors." *Id.* The court explained that one standard deviation meant "the probability would be 16% that the departure is a random event and 84% that it is not." *Id.* Recognizing that one standard deviation was "less than the two standard deviations customarily employed to measure statistical significance," the court emphasized "the defendant still must trace the disparity to some practice or practices" under *Duren*'s third prong. *Id. Lilly* also held the data for the second *Duren* prong should be adjusted to reflect the population in a community that "would actually be eligible for jury service." *Id.* at 304–05.

In the other two cases, the supreme court applied *Lilly*'s holding with modifications to Sixth Amendment fair-cross-section claims and further discussed the application of *Plain* to such claims. *Veal*, 930 N.W.2d at 328–30, 328 n.5; *Williams*, 929 N.W.2d at 629–30, 629 n.1. In all three cases, the supreme court remanded for the district court to consider the fair cross-section claims under the modifications to *Plain*.

Tracking those outcomes, Jones argues his case should be remanded so he may have a chance to "prove up his claim of systematic exclusion" under *Lilly*, *Veal*, and *Williams*. Jones asserted the updated data for African Americans in the pool and panel for his case showed more than one standard deviation from the mean (specifically Z-scores of -1.225 for the pool and -1.066 for the panel).

In response, the State contends those deviations are not enough to satisfy the Sixth Amendment. *See Veal*, 930 N.W.2d at 329 ("We are not persuaded that one standard deviation would be enough to establish the underrepresentation

prong for federal constitutional purposes."). As the State points out, Jones preserved only the federal constitutional claim. The State insists Jones has not explained how he could show the necessary downward variance of two standard deviations to meet federal standards for *Duren*'s second prong. *See id.* The State also argues Jones has failed to offer anything beyond statistics to show systematic exclusion under the third prong.

In his reply brief, Jones acknowledges he is hamstrung by not raising a state constitutional claim in the district court. Even so, he believes a remand is appropriate so he can develop "an additional record" now that our supreme court has clarified the required analysis. *See Veal*, 930 N.W.2d at 330; *Williams*, 929 N.W.2d at 630. At oral argument, defense counsel pointed to the updated statistics for Polk County jury pools in the category of non-whites, which showed Z-scores of -3.53 for the pool and -3.46 for the panel. Counsel urged a claim based on those statistics may be developed on remand.

Like the supreme court in *Veal* and *Williams*, our court has affirmed on condition and remanded to give a defendant the opportunity "to develop his arguments that his constitutional right to an impartial jury was violated." *See State v. Shaw*, No. 18-0421, 2019 WL 5780884, at *4 (Iowa Ct. App. 2019). To be consistent, we follow the same path here. On remand, Jones needs to show not only a lack of fair and reasonable representation in the jury pool, but also systematic exclusion.[7] *See Veal*, 930 N.W.2d at 330 (noting third prong of

---

[7] While Jones sought "an order requiring necessary remedial measures" to ensure his jury pool represented a fair cross-section of the community, he offered no suggestions to achieve that result.

Duren/Plain requires defendant to identify some practice or combination of practices that led to the group's underrepresentation); *Lilly*, 930 N.W.2d at 307 (advising "statistically significant disparities are not enough" and "challenger must tie the disparity to a particular practice."). On those two showings, if the district court finds a Sixth Amendment violation, it must grant Jones a new trial. *See Veal*, 930 N.W.2d at 330; *Williams*, 929 N.W.2d at 630. If the court rejects that claim, then Jones's conviction and sentence will stand. *See Williams*, 929 N.W.2d at 638.

**AFFIRMED ON CONDITION AND REMANDED WITH DIRECTIONS.**