# IN THE COURT OF APPEALS OF IOWA

No. 22-1711
Filed May 8, 2024

**STATE OF IOWA,**
　　Plaintiff-Appellee,

**vs.**

**MARK TODD FISHLER,**
　　Defendant-Appellant.
_____

Appeal from the Iowa District Court for Dubuque County, Monica Zrinyi Ackley, Judge.

The defendant appeals his conviction for first-degree murder. **AFFIRMED.**

Karmen Anderson, Des Moines, for appellant.

Brenna Bird, Attorney General, and Joseph D. Ferrentino, Assistant Attorney General, for appellee.

Heard by Tabor, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

Mark Fishler was convicted of first-degree murder in the killing of his long-time girlfriend's aunt. On appeal, Fishler argues (1) his conviction is not supported by substantial evidence, (2) the district court should have granted him a new trial based on an alleged *Brady* violation,[1] (3) he was deprived of a fair trial due to juror bias, and (4) the weight of the evidence preponderates against the verdict.

## I. Background Facts and Proceedings.

After getting a call asking her to check on her neighbor on the evening of July 15, 2021, Mindy Fagen found the body of Berniece Williamson in the basement of Berniece's home. It was immediately apparent Berniece had been killed; a piece of carpeting covered part of her body, and she had several blunt force injuries to her upper body and head.

Fishler was charged with first-degree murder. He pled not guilty and elected to proceed to a jury trial in August 2022. At the conclusion of a six-day trial, the jury found Fishler guilty as charged.

The district court denied Fishler's post-trial motions, and he was sentenced to life imprisonment and $150,000 in restitution. He appeals.

## II. Discussion.

### A. Sufficiency of the Evidence.

Fishler maintains there is not substantial evidence to support his conviction for first-degree murder. "We review challenges to the sufficiency of the evidence for errors at law." *State v. Armstrong*, 787 N.W.2d 472, 475 (Iowa Ct. App. 2010).

---

[1] *See generally Brady v. Maryland*, 373 U.S. 83 (1963).

When conducting our review, "[w]e review the facts in the light most favorable to the State, including legitimate inferences and presumptions that may reasonably be deduced from the evidence in the record." *Id.* "The State bears the burden of proving every element of the crime with which [Fishler] [was] charged." *Id.*

Here, the State had to prove:

> 1. On or about the 14th day of July, 2021, [Fishler] struck Berniece . . . .
> 2. Berniece . . . died as a result of being struck.
> 3. [Fishler] acted with malice aforethought.
> 4. [Fishler] acted willfully, deliberately, premeditatedly, and with a specific intent to kill Berniece . . . .

As we understand his argument, Fishler challenges whether the State proved he was the person who struck and killed Berniece. *See State v. Jensen*, 216 N.W.2d 369, 374 (Iowa 1974) ("Identity is an element of a criminal offense which the State must prove beyond a reasonable doubt."). And, in the alternative, Fishler argues that even if the State established he was the actor, it failed to prove he acted with premeditation and malice aforethought.

**Identity.** While there were no eyewitnesses to the killing and no physical evidence tying Fishler to Berniece's murder, the circumstantial evidence was legion. Based on footage from a neighbor's security camera, Fishler arrived at Berniece's home at about 1:30 p.m. on July 14, 2021. Fishler carried one bag into Berniece's home through the front door, where she let him in. A little more than an hour later, Fishler left through Berniece's garage door—this time with two bags. After Fishler left, no more activity was seen from Berniece's home; she did not turn on any lights, answer or make any phone calls, or open either of her garage doors (as she often did while smoking a cigarette), and no one else was seen at or around

her home. Meanwhile, Fishler left and went to a scrap metal recycling center, where he removed shoes he had worn to Berniece's and surreptitiously left them behind. From there, Fishler—who the day before had nearly $0 in his bank account and asked to borrow $10 from a friend—went to his landlord's home and paid between $700 and 800 in cash for his rent, which had been due for two weeks. The next morning, on July 15, Fishler went to a local pawn shop and pawned $1325 worth of coins and jewelry. After Fagen found Berniece's body on the evening of July 15 and alerted law enforcement, Fishler returned to the pawn shop on July 16, but this time he asked his friend to pawn the additional items for him—making it so the items could not be traced to him. The friend pawned $1200 worth of coins and jewelry on the second day. One of the items that was pawned was a ring with the engraved initials of "J.E." and "A.W.," which match the initials of Berniece's maternal grandparents. In the meantime, police officers investigating Berniece's death learned her jewelry cabinet was empty and the key to her safe was missing. When he was later interviewed by officers, Fishler brought up the topic of Berniece's safe, showing that he was aware of its existence even though it was generally camouflaged in her bedroom to appear as an end table, covered with a cloth.

When interviewed by police officers, Fishler did not tell them about leaving his shoes at the recycling center—in fact, he claimed to have thrown that specific pair of shoes away a week or so before Berniece's death. He also did not mention pawning items on either July 15 or July 16. And then, on July 21, Fishler seemingly staged his own abduction. While officers were already at his home, they heard someone calling for help behind the home. The officers took off toward the sound

and found Fishler fifty to one-hundred yards away from the house in a wooded area. Fishler had a black garbage bag placed loosely over his head, paper towels stuffed into his mouth, a strap around his legs that an officer removed "with very minimal effort," and imitation handcuffs on his wrists that were released by push lever. Fishler described being dragged to the spot by two men and later, for the first time, told officers that he remembered seeing two men in Berniece's backyard on July 14.

Substantial evidence supports the finding that Fishler was the person who killed Berniece. To summarize: there is no evidence Berniece was alive after Fishler left her home around 2:35 p.m. on July 14, and no one else was seen in or around her home until Fagen found Berniece's body at approximately 4:45 p.m. on July 15; Fishler left Berniece's home with more bags than he carried in; he abandoned his shoes at a recycle center for scrap metal immediately after leaving Berniece's home; he pawned jewelry on July 15 that had Bernice's grandparents' initials on it and asked a friend to pawn additional jewelry on July 16; and he was suddenly flush with cash when his rent had been past due for weeks and his cell phone was not working due to being out of minutes.

**Premeditation.** Next, Fishler argues in the alternative that, even if he was the person who struck and killed Berniece, the State failed to establish he acted with premeditation. He points to the fact that he did not bring a change of clothes to Berniece's house and there was no evidence he searched online for how to get away with murder. But "[t]o premeditate is" just "to think or ponder upon a matter before action," and premeditation "need not exist for any particular length of time" to meet the element. *State v. Fryer*, 226 N.W.2d 36, 41 (Iowa 1975). In other

words, Fishler did not need to have already planned to kill Berniece at the time he got to her home; he could have made the decision sometime after he arrived and still have engaged in premeditation. That said, it is possible Fishler brought the presumed murder weapon—a black metal bar found sitting on a bench in Berniece's garage that was later confirmed to have Berniece's blood on it—with him on July 14, demonstrating that he pondered the matter before acting. The only evidence the metal bar was in Berniece's home before July 14 was Fishler's own statement to an officer that he previously gave Berniece an old metal bar for protection. And even if Fishler did not bring the metal bar with him on July 14, the violent nature of Berniece's death supports a finding of premeditation. *See State v. Blair*, 347 N.W.2d 416, 421 (Iowa 1984) (recognizing that deliberation and premeditation can be shown by "evidence regarding the nature of the killing" and "[t]he use of a deadly weapon accompanied by an opportunity to deliberate is evidence of malice, deliberation, premeditation, and intent to kill").

**Malice aforethought.** For similar reasons, there is also substantial evidence Fishler acted with malice aforethought. *See State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003) ("Malice aforethought is a fixed purpose or design to do some physical harm to another that exists before the act is committed. Like premeditation, it does not have to exist for any particular length of time." (cleaned up)). There is no evidence that Berniece and Fishler engaged in a scuffle or Fishler was otherwise provoked somehow. *See State v. Green*, 896 N.W.2d 770, 779 (Iowa 2017) ("[A] person acts with malice aforethought if the person has a state of mind prompting the person to take the life of another intentionally, without legal justification or excuse."). Berniece was struck in the head, chest, and back several

times with either the black metal bar or something similar, and she ultimately died from blunt force injuries to the head. *See id.* at 780 (allowing the court to instruct the jury that it may infer malice from the use of a dangerous weapon "because a rational juror could infer that one who uses a dangerous weapon intends to cause physical harm, and even to kill"). While Fishler maintains the record is devoid of any evidence he harbored any ill will or grudge toward Berniece, his decision to repeatedly use a dangerous weapon to strike the unarmed eighty-year-old woman in the head, neck, and back is sufficient to conclude that Fishler wanted to injure or kill her. *See State v. Serrato*, 787 N.W.2d 462, 469 (Iowa 2010) (recognizing "malice aforethought often evades direct evidence" but that it "may be inferred by conduct"); *see also Green*, 896 N.W.2d at 779 ("Malice aforethought may accompany an unlawful intent to kill, or may simply be an unlawful intent 'to do physical harm to another' that results in death." (citation omitted)). Substantial evidence supports Fishler's conviction for first-degree murder.

### B. *Brady* violation.

Fishler contends he should have been granted a new trial based on an alleged *Brady* violation. *See Brady*, 373 U.S. at 87 (holding that due process requires the prosecution to disclose exculpatory evidence to the accused). At the hearing addressing his written motion for new trial, Fishler orally raised the issue that one of the State's witnesses was being investigated for the crime of second-degree fraudulent practices at the time the witness testified at Fishler's trial;[2] the witness was charged with the crime after Fishler's trial was finished. Fishler

---

[2] Fishler argued the witness was called to provide "details that [Fishler] supposedly had about a safe in [Berniece's] home."

asserted to the district court that the State intentionally waited to charge the witness until after his testimony was complete to "deprive [Fishler] of the opportunity to cross-examine [the witness] under" Iowa Rule of Evidence 5.609.

As the State advocates, while Fishler raised this issue to the district court, he did not get a ruling, so the error is not preserved for our review.[3]  *See In re Det. of Anderson*, 895 N.W.2d 131, 138 (Iowa 2017) ("In order for error to be preserved, the issue must be both raised and decided by the district court.").  "The reason for this principle relates to the essential symmetry required of our legal system.  It is not a sensible exercise of appellate review to analyze facts of an issue 'without the benefit of a full record or lower court determination[].'"  *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) (quoting *Yee v. City of Escondido*, 503 U.S. 519, 538 (1990)) (alteration in original).  We do not consider this issue further.

**C. Juror Bias.**

Fishler argues he should receive a new trial because the jury was not fair and impartial due to juror bias.  "Juror bias . . . arises when a juror is unable to fairly engage in a determination of guilt or innocence based on the evidence at trial and the court's instructions."  *State v. Christensen*, 929 N.W.2d 646, 661

---

[3] Fishler suggests there was no way to point out to the district court that it failed to rule on the *Brady* issue, so we should conclude that raising the issue to the district court was enough to preserve it.  But this is not a case where the defendant filed a post-trial motion and the district court orally denied the motion in its entirety at the beginning of the sentencing hearing.  Rather, Fishler filed a written motion on September 15, which the district court heard the next day.  The district court entered a multiple-page ruling denying the motion on October 13, and the sentencing hearing took place on October 14.  At the beginning of the sentencing hearing, the district court summarized its ruling on Fishler's post-trial motion; Fishler could have re-raised the alleged *Brady* violation and the court's failure to rule on the issue at that time.

(Iowa 2019). Fishler's claim implicates both his constitutional rights to a fair trial by an impartial jury, *see* U.S. Const. amend. VI, Iowa Const. art. I, § 10, *State v. Lilly*, 930 N.W.2d 293, 298 (Iowa 2019) ("We review constitutional issues de novo."), and the district court's denial of his motion for new trial based on juror bias, *State v. Webster*, 865 N.W.2d 223, 231 (Iowa 2015) ("We review a denial of a motion for a new trial based upon juror misconduct or juror bias for an abuse of discretion."). *But see State v. Ary*, 877 N.W.2d 686, 699 (Iowa 2016) (declining to resolve whether a defendant's claim they were denied the right to a fair trial by an impartial jury should be reviewed under a de novo or an abuse-of-discretion standard). Thus, we review this claim under both standards of review.

Fishler complained that, when speaking with the attorneys after the jury rendered its verdict, one juror asked "whether defense attorneys 'just let them [criminal defendants] make up the lies.'" (Alteration in original.) Fishler asserted this question showed the jury failed to provide him "the invaluable guarantee afforded by the presumption of innocence . . . [that] is the undoubted law, axiomatic and elementary and . . . [which] enforcement lies at the foundation of the administration of our common law." *United States v. Salerno*, 481 U.S. 739, 763 (1987) (Marshall, J., dissenting). The district court denied Fishler's motion, ruling:

> There was testimony at trial about [Fishler's] alleged abduction by third parties. This abduction was part of the defense theory that [Fishler] was not the person who committed the murder of [Berniece]. This abduction story was the subject matter which led to the question about clients making up lies, as the jury did not believe that chain of events. [Fishler] raises this issue in his motion without placing the question into the proper context. The question indicates that the jury followed the Court's instructions by weighing the evidence. They were told they could believe all, part or none of the testimony, which is what they did.

The foregoing issues do not support a finding that [Fishler] did not receive a fair and impartial trial.

Like the district court, we understand the juror's comment about a defendant making up a lie to be about Fishler specifically and based on the evidence the juror heard at trial; we do not understand the juror's comments to reflect prejudice or bias against defendants generally. Fishler was not entitled to a new trial based on alleged juror bias.

**D. Weight of the Evidence.**

Finally, Fishler maintains the greater weight of credible evidence preponderates against the verdict. We review for an abuse of discretion. *State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013).

As he did to the district court, Fishler points out evidence the State did not introduce at trial. He maintains that the lack of his DNA on the presumed murder weapon and the lack of Berniece's DNA found on him or his clothing means there was "no evidence [he] was the person who struck Berniece . . . ." He also challenges the lack of proof that Berniece kept cash in her home, noting the State argued his motive for killing Berniece was money and relied on his paying his past due rent, going to the casino, and buying more cell phone minutes as evidence that Fishler killed Berniece on the afternoon of July 14 before taking her jewelry and items from her safe.

The district court denied Fishler's motion, ruling:

> The jury weighed the following evidence. The neighbors across the street from [Berniece's] home had surveillance video showing that [Fishler] went into the home with one bag, through the front door. He left approximately 90 minutes to two hours later with two bags through the garage. [Berniece's] body was in such a position that no one could have left through the basement door. No

doors or windows were breached. No lights came on in the evening. [Berniece] did not emerge from the side garage door, as was her habit, to smoke. The house was dark, silent and motionless after [Fishler] left. Some crimes are not witnessed and the State must rely on circumstantial evidence as it did here. The jury made deductions and reached conclusions according to their collective common sense that [Fishler] killed [Berniece]. The weight of these facts supports the jury's verdict.

Add to that evidence, the fact that one day prior to the murder, [Fishler] was asking to borrow $10 to turn on his phone. Then, on the day of the event, he all of a sudden has money to pay rent, turn on his phone and go to the casino. He is seen on video at the recycling center looking around his person and then removing the shoes he had on at [Berniece's] home. He left them in the junked bed of a pick-up truck somewhat underneath radiators and other vehicle parts.

[Fishler] told Investigator Kurt Rosenthal many inconsistent stories, including the one about the two men he claimed he saw in the backyard of [Berniece's] home on the day of the incident. He goes on further to state he believed they kidnapped him later and placed a black bag over his head, handcuffed him and left him in the woods. The hand cuffs were not fastened tight and were not real. The bag over his head had a small "breathing hole" which made no sense in light of the fact that had already killed [Berniece] according to the [Fishler]; why leave him alive.

The jury weighed all this evidence. The jury made deductions and reached the conclusion [Fishler] lied about being abducted. The fact the jury did not find his story about the two men credible is rational. The jury could conclude from the facts that [Fishler] received money from what he sold at the recycling center and what he received from pawning the jewelry he stole from [Berniece's] home. These facts can logically be attributed to a motive to kill [Berniece].

The Court has reviewed the litany of facts [Fishler] asserts show he did not kill [Berniece]. The fact that DNA was not found on clothing does not exonerate [Fishler] based on the facts recited herein. [Fishler's] bank records show he was flat broke. The jury could reasonably conclude [Berniece] had money in the safe in her bedroom and [Fishler] took it, which enabled him to pay his rent.

In this way, the district court essentially concluded this is not an "extraordinary case in which the evidence preponderates heavily against the verdict rendered." *State v. Ernst*, 954 N.W.2d 50, 60 (Iowa 2021). And we cannot say the district court abused its discretion.

**III. Conclusion.**

Fishler failed to preserve error on his *Brady* claim. Because substantial evidence supports his conviction, juror bias did not deprive him of a fair trial by an impartial jury, and the greater weight of the credible evidence supports the jury's verdict, we affirm.

**AFFIRMED.**